In re STIGER.

D. C. ANDREWS & CO. v. OSBORNE.

(Circuit Court of Appeals, Third Circuit. December 4, 1913.)

No. 1,736.

BANKRUPTCY (§ 214*)—EQUITABLE LIENS—SUFFICIENCY OF EVIDENCE TO ESTABLISH.

Claimants filed a petition with the referee, claiming a lien on bankrupt's accounts receivable under a written assignment executed within four months prior to the bankruptcy. They afterwards amended the petition asserting a lien under an oral agreement made before the four months' period. The evidence disclosed only that at that time there had been general talk of the bankrupt's securing claimants "with assigned accounts," but no specific accounts were spoken of, and no definite agreement was made by bankrupt to do so, and no notation of such an agreement was made on his books, but he continued to treat the accounts as his own and use their proceeds in his business. Held, that, under the strict proof required by the courts of equity, such evidence was not sufficient to establish an equitable lien.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 320, 324–327, 343, 344; Dec. Dig. § 214.*]

Appeal from the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

In the matter of Augustus K. Stiger, trading as the Stiger Manufacturing Company, bankrupt. From an order denying their claim to the proceeds of bankrupt's accounts receivable, D. C. Andrews & Co. appeal. Affirmed.

For opinion below, see 202 Fed. 791.

Sigmund Solomon, of New York City (David C. Myers, of New York City, of counsel, and Joseph H. Kutner, of New York City, on the brief), for appellants.

Bilder & Bilder, of Newark, N. J. (Nathan Bilder, of Newark, N. J., of counsel), for appellee.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge. This is an appeal by the petitioners, D. C. Andrews & Co., from an order of the court below, sitting in bankruptcy, reversing an order of the referee herein, which granted the prayer of the petitioners for an order on the trustee in bankruptcy to pay to the petitioners the sum of $4,158.81 out of the funds in his hands.

The petitioners had been doing business with A. K. Stiger, the bankrupt herein, for some time prior to January, 1911. At that time, Stiger was indebted to the petitioners in excess of the sum of $6,000.00, for goods sold and delivered, and in December, 1910, an extension of two years therefor had been given to him. In the middle of January, 1911, the question of further sales by the petitioners to Stiger came up, and conversations in regard thereto were had by one of the members of the petitioners' firm and Stiger, and also with his representative. The specific conversation relied upon by the appellants is not testified to, but Mr. Whitehouse, one of the members of the firm of D. C. Andrews & Co., the petitioners and appellants herein, testifies to what he considered a general understanding. The conversation is alleged to have been with Mr. Stiger, the bankrupt, or Mr. Thompson, his representative, and occurred on or about the 19th of January, 1911. The material parts of Mr. Whitehouse's testimony is as follows:

"Q. What was the conversation with Stiger in January, 1911?

"A. With reference to selling merchandise?

"Q. Yes.

"A. We went into the matter of supplying him with further merchandise; we told him we would sell them merchandise, but they would have to secure us against loss.

"Q. For those future sales?

"A. Yes.

"Q. Do you know the exact amount due to your firm by Stiger at that time?

"A. Not exactly, for the moment, no.

"Q. But it was upwards of $6,000, was it not?

"A. Yes, sir; that is right.

"Q. When you and Stiger had this talk, what was done after the talk with reference to putting it in shape?

"A. I don't quite understand that question.

"Q. What was done in reference to putting the talk into the form of an agreement?

"A. When we had the merchandise ready for delivery, I drew up a form of assignment which I submitted to Stiger and Thompson, and there were some objections to its form, and they arranged to have another assignment drawn up and there was considerable talk as to that. Then an assignment was submitted to me, and I made some corrections or suggestions, and finally we had one drawn up which was mutually satisfactory.

"Q. These are the papers which are in evidence, marked Exhibits P—1 and P—2?

"A. Yes; dated February 17th.

"Q. So that the matter of actually putting into writing the agreement ran along for some time?

"A. Some weeks, yes.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. What was the conversation in January, perhaps that is the best way to put it?

"A. I can't give the verbatim conversation, but the material points of the conversation were that we would sell them some goods if they would secure us against loss.

"Q. How?

"A. With assigned accounts.

"Q. What assigned accounts?

"A. Assigned accounts for merchandise they might well, accounts receivable created. All the accounts receivable they would create they were to secure us with, except those which they had to assign to the National Butchers' & Drovers' Bank for pay roll.

"Q. This talk was in January, 1911?

"A. Yes.

"Q. And a paper agreement to carry that out was drawn first by you?

"A. On January 19th, we confirmed a sale to them, in which we stated it was understood we were to have security.

"Q. You mean on January 19th they picked out some goods, purchased some—

"A. They didn't pick them out; we contracted for future delivery.

"Q. And on January 19th you wrote them a letter?

"A. Yes, sir."

The letter referred to is as follows:

"New York, January 19, 1911.

"Messrs. A. K. Stiger & Co. Newark, N. J.

"Gentlemen: In confirmation of 'phone conversation with your Mr. Stiger to-day, we have sold you about 30 tons of Tumaco ivory nuts at 5⅝ cents per lb., against your 60 days' note and as collateral security, a private assignment of sufficient outstanding accounts receivable to keep the above covered. The nuts are due sometime this month.

"We thank you for the order and remain,

Yours very truly,                    [Signed]    D. C. Andrews & Co."

On cross-examination, Mr. Whitehouse said, in answer to the question:

"Q. They wanted more merchandise; what did you say?

"A. That we would give them more, but inasmuch as we had allowed our past indebtedness to go on and be paid at some future time, that we did not want to be involved in any further loss and we would have to be secured for any further merchandise.

        *        *        *        *        *        *        *        *        *        *

"What was your purpose in wanting security; afraid if you didn't you might lose?

"A. Exactly.

"Q. And you were unwilling to extend any further credit, except upon security?

"A. Yes.

"Q. Now what did Thompson and Stiger say to that?

"A. They agreed to give us security.

"Q. What kind of security was talked about?

"A. Assigned accounts.

"Q. Any specific accounts mentioned?

"A. All accounts over and above those assigned to the National Butchers' & Drovers' Bank for pay roll."

The testimony of Mr. Thompson, general manager of Stiger & Co., is as follows:

"Q. Were you present at the conversation of January, 1911, testified to by Mr. Whitehouse?

"A. Yes, the first conversation was had with me.

"Q. In January, 1911?

"A. Yes, sir.

"Q. Do you remember about the date?

"A. I should think somewhere about the 10th; between the 10th and 15th."

In answer to the question, "What was the conversation?" he said:

"A. At the time of the signing of this first agreement (whereby witness became manager for Stiger) there was no thought of any agreement of this sort being made, but they (petitioners) contended that there was being a larger credit given and they had extended their account for two years, and if they were going to give further credit to the company they thought they ought to be secured.

"Q. The first it was mentioned was in January, 1911?

"A. Yes.

"Q. At the time the nuts were to be purchased?

"A. Just about that period.

"Q. What did they say about wanting security; what was the conversation?

"A. Why they said they thought they ought to be secured, just as I told you, on account of already being in $6,000.

$*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$

"Q. What did you say to them when they asked for security for the purchase then to be made?

"A. I said I thought they ought to have the security, if they would carry out that agreement.

"Q. You agreed to it?

"A. Yes.

$*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$

"Q. No matter when delivery was made, it was made in pursuance to this understanding and agreement you and Mr. Stiger had with Mr. Whitehouse on or about January 15th, 1911; is that right?

"A. I think that is my understanding."

It is upon this testimony that the appellants now rely for the establishment of an equitable assignment of the accounts or bills receivable then outstanding and afterwards accruing up to the date of the bankruptcy and to impress upon the proceeds of those accounts, or any of them in the trustee's hands not appropriated by a previous assignment, in due form, to the National Butchers' & Drovers' Bank, a lien or property right in favor of the appellants. Before discussing the efficacy of the testimony, as to what occurred between the parties on or before the 19th of January, 1911, as set forth above, to establish of itself the equitable assignment contended for by the appellants, it is necessary to consider briefly the history of the transactions between the parties subsequent to that date, and for this purpose we quote from Judge Rellstab's summary of the case, the following:

"So far as the testimony discloses, no formal words of transfer in præsenti were used on such occasions, nor any, that a writing formally evidencing such agreement was to be executed; but the subsequent conduct of the parties, rather than any testified-to express words, shows that a more formal agreement was contemplated by them."

The learned judge then recites the letter of January, 1911, from the petitioner to the bankrupt, which we have quoted above. He then says:

"The letter of February 7, 1911, following the last sale of merchandise, states, 'We had expected to hear from you to-day with the form of assignment agreement, and if you have not given this matter your attention we most kindly ask that you do so immediately, as we would like to have this matter put in shape in accordance with the terms of sale.' Whitehouse, in answer to the question, what was done in reference to putting the talk into the form of an agreement, said: 'When we had the merchandise ready for delivery, I

drew up a form of assignment, which I submitted to Stiger and Thompson, and there were some objections to its form, and they arranged to have another assignment drawn up, and there was considerable talk as to that. Then an assignment was submitted to me and I made some corrections or suggestions, and finally we had one drawn up which was mutually satisfactory.' "

The assignment here referred to is dated the 17th day of February, 1911, and is accompanied by an agreement of the same date. It was a tripartite agreement between D. C. Andrews & Co. (the appellants), of the first part, Augustus K. Stiger, doing business under the firm name of Stiger Mfg. Co. (the bankrupt), of the second part, and Charles O. Thompson, of the third part. After prefatory recitals at considerable length, the agreement proceeds as follows:

"First: The party of the first part hereby agrees to sell and deliver to the party of the second part from time to time hereafter certain vegetable ivory nuts and raw material and to accept therefor the regular form notes duly signed by the party of the second part and countersigned by the party of the third part as manager payable sixty (60) days after date of invoices for the amount of each such invoice, and if required by the party of the second part, agrees to give an extension of thirty (30) days on each note from the maturity thereof, and interest for said thirty (30) days shall be charged by the party of the first part on each note, which interest shall be paid thereon by the party of the second part.

"Second: The party of the second part hereby agrees to give to the party of the first part his regular form notes, duly signed by him, and countersigned by the party of the third part as manager, for all vegetable ivory nuts and raw material purchased by him from time to time hereafter from the party of the first part, payable sixty (60) days after date of invoices for the amount of each such invoice, it being understood and agreed that an extension of thirty (30) days from the maturity of each note shall be given by the party of the first part, if required by the party of the second part, and that interest for said thirty (30) days shall be charged by the party of the first part on each note which interest shall be paid thereon by the party of the second part.

"Third: The party of the second part further agrees to assign, transfer and set over unto the party of the first part, from time to time, all accounts receivable created from the sale of buttons or other articles manufactured by the party of the second part as security for the promissory notes given by the party of the second part as hereinabove set forth, it being distinctly understood and agreed, however, that the assignments of such accounts receivable are to be and shall be made at all times subject to the prior assignments made by the party of the second part to the National Butchers' & Drovers' Bank for moneys advanced or to be advanced for the purposes of meeting the pay rolls for the business of the party of the second part, and, if absolutely necessary, for other purposes of the business of the party of the second part, with the approval and consent of Alfred E. Whitehouse and David H. Rowland."

Article Fourth of the agreement provides that the party of the third part shall act as the "agent and attorney for the party of the first part, for the purpose of collecting the accounts receivable assigned to the party of the first part, subject to any prior assignment thereof" to the bank, and the party of the third part agrees to become the lawful agent and attorney for the party of the first part, for the purpose aforesaid.

By the sixth article of the agreement, it is provided that the parties of the second and third parts

"shall and will, on Saturday of each week, from and after the date hereof, send to the party of the first part a statement showing the total amount of

bills receivable then on the books of the party of the second part, and of the total amount of such bills assigned to the National Butchers' & Drovers' Bank, as security for advances made to meet the pay rolls of the party of the second part, and if absolutely necessary, for other purposes of the business of the party of the second part, with the approval and consent of Alfred E. Whitehouse and David H. Rowland."

This agreement is signed and sealed as follows:

"D. C. Andrews & Co.,
    "By A. E. Whitehouse.    [L.S.]
"A. K. Stiger.    [L.S.]
"C. O. Thompson.    [L.S.]"

This agreement was acknowledged by the parties thereto before a notary public on the day of its date, and duly recorded in the office of the register in the county of Essex on the 20th day of March, 1911. The assignment executed by A. K. Stiger, on the same day with and accompanying the agreement, is as follows:

"For the purpose of securing to D. C. Andrews & Co., of the borough of Manhattan, of the city, county and state of New York, the payment of a certain obligation or of certain obligations made by me, and now held by said D. C. Andrews & Co., or which may hereafter be given by me and held by said D. C. Andrews & Co., together with the renewal and renewals and extension and extensions thereof, and also in consideration of the sum of one dollar, lawful money of the United States, to me in hand paid, the receipt of which is hereby acknowledged, I, Augustus K. Stiger, doing business under the registered name or firm of A. K. Stiger & Co., and also under the registered name or firm of the Stiger Manufacturing Company, of the city of Newark, state of New Jersey, hereby sell, assign, transfer and set over to D. C. Andrews & Co. any and all claims, demands and book accounts, subject, however, to any prior assignment or assignments made by me of any or all of said claims, demands and book accounts to the National Butchers' & Drovers' Bank of the City of New York, for moneys advanced for the pay rolls for my said business, or for other purposes of my said business. It being understood that all claims, demands and book accounts now due to me, as doing business under the registered name or firm of A. K. Stiger & Co., and also under the registered name or firm of the Stiger Manufacturing Company, or which may hereafter become due, shall be and are hereby considered assigned to D. C. Andrews & Co. at all times until the full amount due to said D. C. Andrews & Co., under a certain agreement bearing date the 17th day of February, 1911, shall have been paid, but always subject to any prior assignment or assignments to said National Butchers' & Drovers' Bank, as aforesaid, and I hereby undertake, on behalf of and as agent for said D. C. Andrews & Co., to collect the said moneys and to turn over to said D. C. Andrews & Co. the moneys received from each of the said claims as collected in excess of the assignment or assignments to said National Butchers' & Drovers' Bank, until the whole of the indebtedness now due or which may hereafter become due to said D. C. Andrews & Co. under said agreement of the 17th day of February, 1911, shall have been fully paid.

"I have made the proper notation of said assignment on my books.

"In witness whereof, I have hereunto set my hand and seal this 17th day of February, 1911.                                      A. K. Stiger. [L.S.]"

The bankrupt was so adjudicated in involuntary proceedings instituted against him on the 8th day of June, 1911. Thereafter, in a petition presented to the referee claiming such book accounts, or the proceeds thereof in the hands of the trustee, the appellants, as petitioners, based their right thereto absolutely upon the written agreement and accompanying assignment of the 17th of February, 1911,

above recited. They annex the said agreement and assignment to their petition and allege in the first paragraph thereof that, on the 17th day of February, 1911, the said agreement was entered into, whereby petitioners agreed to sell to bankrupt such merchandise as he may need, provided that the bankrupt assign to petitioners all book accounts then in existence, or thereafter to arise from sales of such merchandise.

In the fourth paragraph, they allege that, in addition to said agreement, on the same day, viz., the 17th of February, 1911, the said A. K. Stiger executed and delivered to petitioner the assignment in writing, a copy of which was set out and attached to said petition, whereby he duly assigned all his book accounts then existing and to arise from the sale of the merchandise by the petitioners to the bankrupt. The sixth paragraph of said petition is as follows:

"Sixth: That pursuant to said agreement of February 17, 1911, and pursuant to the assignment of accounts dated February 17, 1911, and relying upon the aforementioned agreement, your petitioners did sell and deliver to said A. K. Stiger, at agreed prices certain goods, wares and merchandise amounting to three thousand eight hundred and seventy-one 80/100 ($3,871.80) dollars, a statement of which is hereto annexed and made part and portion hereof."

The petition then alleges, upon information and belief,

"that upon the sale of such merchandise, accounts have arisen therefrom, which under the terms of said agreement and assignment of accounts, became the property of your petitioners."

They then claim in the hands of the trustee the accounts, or the proceeds thereof, referred to and assigned in the written agreement and assignment of the 17th of February, 1911.

After the filing of the trustee's answer to this petition, and on the day set for the taking of the testimony on the issues raised thereby, the petitioner sought and obtained permission to amend its petition; the petition, as amended, asserts that the assignment was made, not on the 17th day of February, 1911, the date of the said written agreement and assignment, but on or about the 19th day of January, as already mentioned; thus substituting for the legal written assignment of the 17th of February, 1911, the asserted equitable assignment on the 19th of the preceding January. It cannot escape observation that the written agreement of the 17th of February was within the four months' period, and for that reason subject to the provisions of section 67e of the Bankrupt Law (Act July 1, 1898, c. 541, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]).

Appellants then contended before the referee in the court below, and now contend, that these agreements of February 17th confirm the oral understanding of the parties and show their course of dealing, and do not supplant the oral agreement, but that they refer to subsequent transactions to be had between the parties. The basis upon which their petition was originally presented, was abandoned, and resort is had to sustain their claim to an alleged equitable assignment made at a date that would carry it beyond the four months' period of the bankrupt law above referred to.

It is unnecessary to more than refer to the development of the equitable jurisdiction for the enforcement of nonlegal contracts, as illustrated in the decisions of courts of equity in this country and in England. The doctrine, so called, of equitable assignment, as the outgrowth of the exercise of this jurisdiction is fully discussed by all modern text writers on equitable jurisprudence, and by no one more clearly and satisfactorily than by Pomeroy. As pointed out by him, the essential elements of the contract are the same in equity as at law. There must be a clearly ascertained subject-matter, and in general the same rules prevail in both jurisdictions as to parties and their capacity to contract as to consideration and as to the assent or aggregatio mentium.

The very fact that courts of equity will enforce agreements between parties that lack the requirements of contracts enforceable at law, has rendered them the more strict in demanding, as a condition to such enforcement, that the intention of the parties to enter into a present contractual relation shall be clearly proved, and that there shall be no vagueness or uncertainty as to the terms and substance of the agreement.

We have already recited in full the testimony upon which an equitable assignment here is asserted. We fail to gather from it a clear, definite purpose of a present appropriation by Stiger & Co. of sufficiently specified accounts to meet the requirements of an enforceable equitable assignment. The most that can be gathered from these conversations, as to the intention of the parties, is an understanding that thereafter an assignment should be made of outstanding accounts to secure shipments of material by the appellants to the bankrupt, subject, however, to a prior assignment to the National Butchers' & Drovers' Bank, to secure advances for pay rolls and other purposes, as the same should be made by it.

The testimony of Mr. Whitehouse, a member of the appellant firm, is meager as to details and fragmentary as to the matters testified about. He says that, in a conversation with Stiger, in January, 1911, "we went into the matter of supplying him with further merchandise. We told him we would sell them merchandise, but they would have to secure us against loss."

Nothing is then said as to any agreement by Stiger, or that there was any response to what was said by Whitehouse. Further on in the examination, in answer to the question, "What was done in reference to putting the talk into the form of an agreement?" Whitehouse says:

"When we had the merchandise ready for delivery, I drew up a form of assignment, which I submitted to Stiger and Thompson, and there were some objections to its form, and they arranged to have another assignment drawn up, and there was considerable talk as to that. Then an assignment was submitted to me, and I made some corrections or suggestions, and finally we had one drawn up which was mutually satisfactory."

Nothing is testified to by Whitehouse as to anything said by Stiger.

After several palpably leading questions by his counsel, this question is put:

"What was the understanding and agreement then as set forth in these papers—I mean in January, prior to the delivery or sale of these goods?"

This was objected to, and the question was then put:

"What was the conversation in January? A. I can not give the verbatim conversation, but the material points of the conversation were, that we would sell them some goods if they would secure us against loss."

When asked how, he answered:

"With assigned accounts."

He then testifies to a sale made on January 19, 1911, and the letter written on that day, which we have quoted in full. It is only necessary to say of this letter that it is a letter written by the appellants themselves, giving their understanding of a conversation, only one side of which has been testified to.

The only other testimony by Whitehouse, referring to the giving of security, was the rather indefinite answers to questions on cross-examination, as, for instance:

"Q. Now what did Thompson and Stiger say to that?
"A. They agreed to give us security.
"Q. What kind of security was talked about?
"A. Assigned accounts. All accounts over and above those assigned to the National Butchers' & Drovers' Bank for pay rolls."

His whole testimony is of this indefinite character, and relates only to what he understood was the result of the conversation with Stiger, without stating what that conversation was. It is true that Thompson, the manager for Stiger & Co., said in a general way, that it was his understanding that security was to be given by assigning outstanding accounts. This testimony not only fails to give any clear and positive language by Stiger, evidencing an intention of a present appropriation of specific accounts, as security for merchandise thereafter to be delivered, but fails to give anything said by Stiger at all, or by any one in his behalf. Not only this, but all that is said by Whitehouse himself in his testimony, as to the understanding had by him with Stiger & Co., clearly points to some agreement in the nature of an assignment thereafter to be made of outstanding accounts due or to become due to Stiger & Co., as security to the appellants. Moreover, the conduct of the parties after the 19th of January, 1911, confirms this interpretation of the conversations with Stiger, as testified to by Whitehouse.

There is no ground to support a contention that an agreement and the accompanying assignment of the 17th of February, 1911, constituted a more formal embodiment in writing of what had been previously agreed to on January 19th. These papers speak for themselves, and they evidently embody all that could be relied upon as a specific assignment of the accounts referred to therein. Moreover, in neither of these papers, one of which by way of recital goes at considerable length into the history of the previous relation of the parties, is reference made, either expressly or by implication, to any previous agreement or assignment, by way of pledge or otherwise, of the accounts now in question.

Nor can the interpretation put by the parties themselves upon the situation be ignored. The fact that the appellants in their original petition relied entirely upon the written assignment of February 17th, and made no reference to any supposed agreement or assignment of the

19th of January, 1911, as now relied upon, is pregnant with meaning as to the understanding of the parties.

It is also undisputed that no notation of an assignment or other entry indicating any agreement between the parties in regard to this account was made upon the books of Stiger & Co. until after the written assignment of the 17th of February. It was only after the written assignment of that date, and in accordance with the stipulation therein contained, that any statement of the accounts outstanding was made to the appellants, and that statement, too, was a very meager one and only referred to the total amount of accounts outstanding and appropriated to the advances of the National Butchers' & Drovers' Bank. There was not only no notation upon the books prior to February 17th, but the testimony shows that Stiger & Co., between January 19th and that date, considered themselves in full control of the outstanding accounts due the firm, collecting the same and applying the proceeds to their current business.

We cannot but agree with the conclusion arrived at by the learned judge of the court below (Rellstab, J.), that there is no such evidence of a then present appropriation by Stiger & Co., on the 19th of January, 1911, of the outstanding accounts here in question, as would constitute an equitable assignment thereof.

It is unnecessary to discuss the evidence on which the court below finds that the written assignment of February 17th comes within the prohibition of section 67e of the bankrupt law, because the appellants, petitioners below, base their entire claim upon the transactions between the parties on January 19, 1911, abandoning the written instruments which they claim do not refer to the transaction now in question, but to transactions between the parties thereafter occurring. All the points in controversy have been thoroughly and ably discussed by the lower court, and its order in the premises is therefore affirmed.