MANUFACTURERS LIFE INSURANCE COMPANY, A FOREIGN CORPORATION, *v.* THE von HAMM-YOUNG COMPANY, LIMITED, AN HAWAIIAN CORPORATION, HAWAIIAN TRUST COMPANY, LIMITED, AN HAWAIIAN CORPORATION, WALTER J. SNYDER, AND MARGUERITE FISHER.

No. 2275.

ARGUED JULY 2, 1937.            DECIDED SEPTEMBER 14, 1937.

COKE, C. J., BANKS AND PETERS, JJ.

By a bill of interpleader the petitioner, Manufacturers Life Insurance Company, sought in the court below to have a judicial determination of the rights of the several respondents in a fund of $10,000 in the possession of the petitioner, which fund represents the proceeds of a group life insurance policy issued by petitioner to Joseph Ralph Fisher, who died September 17, 1934. It is alleged in the bill that conflicting claims to said fund have been asserted by respondents, and the petitioner being unable to ascertain the facts and in doubt as to which of the claimants the money should be paid, prays that respondents be subpoenaed "into court to answer and set forth their several rights, interests and claims in the said fund, if any they have, and interplead, settle and adjust their claims and demands between themselves."

Fisher, the insured, was at the time of his death, and for some six years prior thereto had been, an automobile salesman in the employ of the respondent, The von Hamm-Young Company, Limited. In March, 1929, the petitioner issued its group insurance policy No. 13 to The von Hamm-Young Company on the lives of a number of the employees of the latter company, Fisher being included therein to the extent of $10,000, and certificate No. 33 was thereupon delivered by the insurance company to Fisher. Marguerite Fisher, the wife of the insured, was named the beneficiary. The certificate of insurance provided that the insured might at any time appoint a beneficiary or change the beneficiary already appointed on written notice to the company.

In the month of May, 1932, Fisher, because of ill health, departed from the Territory and remained absent until his death.

On July 15, 1929, and shortly after the life insurance certificate was issued to Fisher, a trust agreement was

entered into between him and the respondent, Hawaiian Trust Company, Limited. This agreement named the Hawaiian Trust Company, Limited, trustee and was in the usual form of a life insurance trust agreement. It included other life insurance policies, in addition to the one in question. Fisher reserved to himself all benefits of the policy during his lifetime. He also reserved the right at any time to modify or revoke entirely the trust agreement, as well as the right to change the beneficiary by serving written notice upon the trustee. Fisher did not assign the policy of insurance to the trustee but issued a declaration, changing the beneficiary from Mrs. Fisher to the trustee.

The respondent, The von Hamm-Young Company, Limited, filed its answer denying any right of the Hawaiian Trust Company in the fund in question, and alleged that the trust agreement between the trust company and Fisher violated the rule against perpetuities and was therefore wholly void. The answer contained the further allegation "that at the time of the death of said Joseph Ralph Fisher he was indebted to the said respondent, The von Hamm-Young Company, Limited, in the sum of $3813.43, of which amount $301.55 was for premiums paid for the carrying of the identical insurance policy set forth and referred to in the petition; that on or about November 15, 1933, said Joseph Ralph Fisher, deceased, assigned, set over and transferred unto this respondent, the Von Hamm-Young Company, Limited, certain money out of said insurance policy to pay this respondent the sum aforesaid, and any other indebtedness that might be due and owing or thereafter to become due and owing from said Joseph Ralph Fisher to said The von Hamm-Young Company, Limited."

The Hawaiian Trust Company, by its answer, claimed the entire fund under the terms of the trust agreement, a copy of which was appended to the answer. At the conclu-

sion of the trial the circuit judge sustained the claim of the trust company and held that it, as trustee, was entitled under the trust agreement to receive the whole amount payable under the life insurance policy less a small sum allowed for costs and counsel fees and that The von Hamm-Young Company, Limited, had no right or interest therein. A decree to that effect was entered, and included therein was a judgment in favor of the Hawaiian Trust Company and against The von Hamm-Young Company, Limited, and Walter J. Snyder, jointly and severally, for the sum of $192 to pay certain counsel fees and costs incurred. From the decree The von Hamm-Young Company, Limited, has perfected an appeal to this court.

The appellant cites as the basis of its appeal the following errors:

"I. The court erred in not excluding the purported trust agreement on the grounds that it was null and void and of no effect because it violates the rule against perpetuities.

"II. The court erred in excluding the offer of evidence on the part of The von Hamm-Young Company, Limited, of a statement of advances made by it to Mr. Fisher in the form of insurance premiums on the insurance in question on the grounds that it was incompetent, irrelevant and immaterial because it had not been called to the attention of Hawaiian Trust Company, Limited.

"III. That the court erred in excluding the offer of evidence on the part of The von Hamm-Young Company, Limited, of the statement of account from October 31, 1934, of advances made to Mr. Fisher on the grounds that it was incompetent, irrelevant and immaterial because it was not called to the attention of Hawaiian Trust Company, Limited.

"IV. The court erred in excluding the evidence in the form of correspondence between Mr. Fisher and E. E.

Bodge of The von Hamm-Young Company, Limited, to prove the existence of an equitable lien and the giving of an equitable assignment to The von Hamm-Young Company, Limited, as security for advances made by it on the grounds that it was incompetent, irrelevant and immaterial because it had not been called to the attention of Hawaiian Trust Company, Limited.

"V. The court erred in not finding that The von Hamm-Young Company, Limited, had a lien on the proceeds of the policy for the amount of advances made by it to pay premiums on the insurance in question to keep it from lapsing.

"VI. That the court erred in taxing the attorney's fee of the petitioner against The von Hamm-Young Company, Limited, and Walter J. Snyder, Respondents."

The well-known doctrine of the common law, which perhaps for lack of a better name is referred to as "the rule against perpetuities," prescribes that no interest is good unless it must vest, if at all, not later than twenty-one years after a life in being at the creation of the interest, to which is added the period of gestation if gestation exists. This rule was not of feudal origin but has its support in the practical needs of modern times, and was devised in order to restrain the tying up of property in future estates for an unreasonable period of time. That the rule against perpetuities is in force in the Territory of Hawaii was decided by this court in *Fitchie* v. *Brown*, 18 Haw. 52, and *Spreckels* v. *Spreckels*, 21 Haw. 556. In *Fitchie* v. *Brown* it is said: "The rule against perpetuities is law in Hawaii, being a rule of the English common law which is declared in the Judiciary Act of 1892 (R. L., Sec. 1) to be in force here." See also 211 U. S. 321 where the same case was considered on appeal.

In the application of the rule it is not sufficient that the future interest may or probably will vest within the limits of the rule of perpetuities, nor on the other hand is

it necessary in order to call for the application of the rule that it will probably or certainly vest beyond such limits. A possibility that it may do so is fatal to its validity. (See 48 C. J. 944.) Any limitation or provision, the probable or possible effect of which is to cause an estate to commence in the future, is invalid if, as a result thereof, the estate may commence more than twenty-one years after a life or lives in being. To this may be added, in case of necessity, that of an infant in *ventre sa mere,* "the period of gestation thereafter." If, therefore, the trust instrument became effective to create the estate at the time of its execution, namely, July 15, 1929, it must be conceded that there was a possibility, although perhaps a remote one, that the trustee would retain ownership and control of the property of the trust for a period greater than a life in being and twenty-one years. On the other hand, if, as is contended by the trust company, there was no vesting of the interest—no absolute suspension of ownership—prior to the death of Fisher, which occurred in September, 1934, no transgression of the rule against perpetuities could occur and the validity of the trust instrument must be upheld. The question then is, when did the future estate come into existence; when did the period fixed by the rule commence to run; should that time be reckoned from the date of the instrument or the date of the death of Fisher? We must turn to the trust instrument itself for answer.

Paragraphs 1 to 5 inclusive of the trust agreement bear upon the question and provide as follows:

"1. The Trustee shall hold said policies, including any such policies hereafter delivered to it, during the life of the Settlor, without any liability on its part to pay any premium, assessment or other sum that may become due and payable thereon and without any other obligation on its part of any nature in respect thereto other than the safekeeping thereof.

"2. The Settlor reserves to himself during his life all payments, dividends, surrender values, proceeds of matured endowments and benefits and payments of any and every kind which may accrue on account of any policies held hereunder and the right at any time to exercise any right of conversion or other option or privilege with respect to any of said policies, and to borrow money on any of said policies and to pledge the same as security therefor.

"3. The Settlor also reserves the right to remove from under the operation hereof any or all of the policies held hereunder at any time upon service of written notice upon the Trustee; and upòn the receipt of such notice the Trustee will return any or all of said policies, as the case may be, to the Settlor, and shall execute all necessary endorsements or assignments thereof.

"4. Upon receiving proof of the death of the Settlor, the Trustee shall use its best efforts to collect and receive any and all sums of money payable under said policies; provided, however that the Trustee shall not be obligated to institute or maintain any action or proceeding for the purpose of collecting any such sums unless and until it shall have indemnified in such amount and in such manner as it may require against any and all liabilities, costs and expenses which may be incurred by it in such action or proceeding. The Trustee may receipt for and grant any necessary releases in connection with the collection of any such sums and is specifically authorized to settle, adjust and compromise any claims arising out of said policies or any of them, upon such terms and conditions as it may deem just and advisable, and any decisions made by it with re-spect thereto shall be binding and conclusive upon all per-sons interested herein. No insurance company or other person or corporation paying any such sums to the Trustee shall be under any obligation to see to the application thereof or to the authority of the Trustee.

"5. The Trustee shall hold and invest any and all such sums collected or received by the Trustee, as a trust estate, and shall pay, use, apply and distribute the income thereon and the principal thereof, as follows:

"(a) The Trustee shall pay all of the net income derived from said trust estate, in monthly instalments as nearly equal in amount as may in the discretion of the Trustee be practicable, and also when it shall seem advisable in its discretion because of special need portions of the principal of said trust estate, to the wife of the Settlor, Marguerite Fisher, if she shall survive him, during her life, for her maintenance and support and for the maintenance, support and education of the children of the Settlor and for such other purposes as said wife of the Settlor shall desire.

"(b) After the death of the survivor of the Settlor and his said wife the Trustee shall pay, use and apply all of the net income from said trust estate, and also from time to time whenever it shall seem advisable in its discretion because of special need portions of the principal of said trust estate, for the maintenance, support and education of the surviving children of the Settlor,—in the case of each of said surviving children until he or she shall have received his or her share of the principal of said trust estate pursuant to the provisions of paragraph (c) hereinafter set forth. The Trustee may apportion said income and portions of principal among said surviving children without any obligation to divide the same proportionately, either temporarily or permanently. Any such income or principal shall not in any way be charged against or deducted from any amounts of principal to which any of the children of the Settlor or the issue or nominees of any deceased children of the Settlor shall at any time be entitled pursuant to the provisions of said paragraph (c).

"(c) When any son of the Settlor shall reach the age of twenty-five (25) years or shall die before reaching that

age leaving issue surviving him, and when any daughter of the Settlor shall die before reaching the age of twenty-five (25) years leaving issue surviving her, the Trustee shall transfer, convey and deliver, absolutely and in fee simple and free from any trust, to such son or daughter, or to his or her issue, as the case may be, such issue taking per stirpes by right of representation, his, her or their share of the principal of said trust estate,—said share to be ascertained by dividing said principal (or so much thereof as shall not theretofore have been distributed pursuant to the provisions of this agreement) by the total number of the sons of the Settlor who shall be then surviving under the age of twenty-five (25) years together with the total number of the daughters of the Settlor who shall be then surviving and together also with the child who has just reached such age or who has just died leaving issue then surviving. When any daughter of the Settlor shall die after reaching the age of twenty-five (25) years, the Trustee shall transfer, convey and deliver, absolutely and in fee simple and free from any trust (except as may be provided in the will of such daughter), to such person or persons as may be appointed by the will of such daughter, or, if there shall be no such appointment, to the issue, taking per stirpes by right of representation, of such daughter, or, if there shall be no such appointment and no such issue, to those who shall be then surviving of the sisters of the Settlor, the share of such daughter of the principal of said trust estate,—said share to be ascertained by dividing said principal (or so much thereof as shall not theretofore have been distributed pursuant to the provisions of this agreement) by the total number of the sons of the Settlor who shall be then surviving under the age of twenty-five (25) years together with the total number of the daughters of the Settlor who shall be then surviving and together with such daughter.

"(d) In case, after the distribution of one or more shares of the principal of said trust estate shall have been made pursuant to the provisions of the next preceding paragraph hereof, any child of the Settlor shall die before reaching the age of twenty-five (25) years without leaving issue surviving him or her, the Trustee shall then transfer, convey and deliver, absolutely and in fee simple and free from any trust, to each of the sons of the Settlor who shall theretofore have reached the age of twenty-five (25) years and to the issue then living of any children of the Settlor who shall theretofore have died leaving issue, such issue taking per stirpes by right of representation, his or their portions of the share of such deceased child of the principal of said trust estate. Said share of such deceased child shall be the share of said trust estate which would have gone to the issue of said deceased child if said deceased child had been survived by issue; and the portions above referred to of said share shall be ascertained by dividing said share by the total number of the children of the Settlor then living together with the number of said children who shall theretofore have died leaving issue who shall be then living.

"(e) If upon the death of the last survivor of the children of the Settlor and of all of the issue thereof not all of said trust estate shall have been distributed and there shall be no provisions hereinbefore set forth providing for the distribution thereof, then and in such case the Trustee shall transfer, convey and deliver said trust estate (or so much thereof as shall not theretofore have been distributed pursuant to the provisions of this agreement), absolutely and in fee simple and free from any trust, to those who shall be then surviving of the sisters of the Settlor."

This document created what is called an unfunded life insurance trust. It remained a dry trust until Fisher's death and could only then become active in case he had

not, during his lifetime, revoked the trust or changed the beneficiary. It is of importance to note that under the provisions of the trust instrument the Settlor reserved to himself, while alive, the right of complete ownership, control and dominion over the policies of insurance. He reserved the power to destroy the trust at will. He also reserved all benefits of the policies and the right at any time to withdraw any or all of them from the operation of the trust instrument, as well as the right to change the beneficiaries named therein by merely serving written notice upon the trustee. The policies were never assigned to the trustee but Fisher executed a declaration naming the trust company the beneficiary. This declaration he, of course, could have annulled at any moment.

The trustee assumed no responsibility during Fisher's lifetime aside from an obligation to hold the policies in its possession subject to Fisher's right of ownership and power of control.

As a general rule where an interest in real or personal property is created by a trust instrument and the settlor does not reserve the right to revoke or destroy the trust, the remoteness of the trust is to be determined from the date of the delivery of the trust instrument.

If, however, a trust is created by a settlor for life and then over and he retains the power of revocation or destruction, there is no suspension during the settlor's life. (See 30 Cyc. 1510, 1511.)

In his standard work on perpetuities, Professor Gray, after pointing out that the rule is applied with strictness, and that courts attend in applying it to the substance rather than to the form of future limitations, goes on to say: "Thus a future interest, if destructible at the mere pleasure of the present owner of the property, is not regarded as an interest at all, and the Rule does not concern itself with it. For instance, such limitations after an estate

tail as must take effect, if at all, not later than the termination of the estate tail, are never too remote; the present tenant in tail can destroy them all at any moment by docking the entail." Gray's Rule Against Perpetuities, p. 175.

A recent illuminating discussion of the subject is contained in 45 Harv. L. Rev. 896. The author says (p. 900) : "These cases demonstrate that in calculating the period of perpetuities the courts have wisely excluded that period during which the property was subject to the absolute control of a single person. To determine whether the life of the insured shall be considered in measuring the period of perpetuities it would therefore seem essential to inquire what control he could exercise over the policy. The simplest case is that in which the trustee is beneficiary under the policy. If the right to change the beneficiary has not been reserved the insured has so far prevented himself from exercising control that it would be proper to measure the distance of the limitations from the date of the creation of the trust. But if the right has been reserved the insured is the dominus of the policy during his lifetime and that period should be disregarded." (See also 46 Harv. L. Rev. 818.)

In *Pulitzer* v. *Livingston*, 89 Me. 359, the following significant language is used: "The very definition of a perpetuity as given by Lewis has its application to a future limitation 'which is not destructible by the persons for the time being entitled to the property subject to the future limitation, except with the concurrence of the individual interested under that limitation.' The deeds in question contain certain express powers of revocation. The equitable owners of the estate have therein expressly reserved the right at any and all times 'to alter, change, revoke, annul and destroy all and every the trusts hereby created. * * *' These powers clearly provide for a complete revocation of the trusts at any time, and thereby remove the case from the rule against perpetuities."

In *Mifflin* v. *Mifflin,* 121 Pa. St. 205 at page 224 the court said: "The question is, whether the provisions of the original deeds of 1813 and 1816 are inoperative because of the rule against perpetuities. They are, if they create inalienable and indestructible estates, to continue longer than the prohibited period. But the estate of Mrs. Mifflin was neither inalienable nor indestructible. It was destructible by her own act. It was entirely within her power to become the owner in fee simple of the estates granted and to totally defeat any ulterior limitations." (See also *Cooper's Estate,* 150 Pa. St. 576.)

In the more recent case of *Equitable Trust Co.* v. *Pratt,* 193 N. Y. S. 152, the court had before it for determination the validity of an *inter vivos* trust under the laws of New York. The trust agreement was attacked on the grounds that it violated the New York rule against perpetuities which, under the statute of that State, forbids the suspension of the absolute ownership of personal property for a longer period than the duration of two lives in being. The trust document provided "this trust shall be revocable at will by the party of the first part by notice in writing signed by the party of the first part and delivered to the trustee." This language is strikingly similar to that used in the trust agreement in the case at bar. The New York court said: "As a result of the revocation clause the absolute ownership was not suspended at all during Palfrey's life. Ownership would not be suspended until Palfrey should die without having revoked the trust." For an analogous case see *Reinecke* v. *Northern Trust Co.,* 278 U. S. 339.

The fact that in the New York case the court was dealing with an *inter vivos* trust and in New York the period of the rule of perpetuities is fixed by statute and differs slightly from our own is immaterial. The principles of law involved in the two cases are parallel.

The future estate created by Fisher not having been de-

stroyed by him in his lifetime came into being at his death on September 17, 1934. It was therefore certain to vest, within the limits of the rule of perpetuities, and the provisions of the trust instrument did not transgress the rule.

Appellant's assignment of errors 2, 3 and 4 may be grouped. They specify as prejudicial error to appellant the refusal of the trial court to admit in evidence a statement of advances made by it to Fisher and certain correspondence which took place between Fisher and E. E. Bodge, an officer of The von Hamm-Young Company, Limited. These documents were offered "to prove the existence of an equitable lien and the giving of an equitable assignment to The von Hamm-Young Company, Limited, as security for advances made by it."

The trial court rejected the offers of proof on the theory that because none of the documents had been brought to the attention of the trustee by service upon it of written notice as required in paragraph 3 of the trust document they were incompetent. The statement of account, as well as the correspondence, was introduced into the record and duly marked for identification. These documents are all before us in the record on this appeal. We find it unnecessary to decide whether the trial court should or should not have received the statement and correspondence in evidence. This being an equity appeal the excluded documents will be considered here in the same manner as will all other evidence, to determine whether the decree of the court below should be sustained.

In *McKinnon* v. *McIlhargey*, 135 Pac. 826, a deed was offered in evidence by plaintiff but held inadmissible by the trial court. The supreme court of Idaho held: "Conceding that all of the rejected evidence had been admitted, it is clear that the plaintiff would not have been entitled to a judgment in this case, and it is a well-established rule of law that if the evidence offered by the plaintiff in support

of his complaint and rejected by the court, if taken into consideration in the determination of the case, would not have entitled the plaintiff to recover, the case will not be reversed on appeal because of an error in rejecting such evidence. If the court makes an error in rejecting evidence, and arrives at a correct conclusion in the case, the judgment ought not to be reversed. The plaintiff has come into a court of equity for equitable relief, and the record shows that all of the equities are with the respondents." (See also *Schroeder* v. *Pratt,* 60 Pac. 512; *Lombard* v. *Columbia Nat. Life Ins. Co.,* 168 Pac. 269; *Tanous* v. *Johnston,* 232 Pac. 793; *Kiehn* v. *Bestor,* 30 Ill. App. 458.)

That this court on an equity appeal will review the entire record before it and make its own findings of fact as well as rulings of law is authorized by section 3503, R. L. 1935. (See *Estate of Isenberg,* 28 Haw. 590; *Bradbury* v. *Bradbury,* 29 Haw. 638; and *Wilder* v. *Pinkham,* 23 Haw. 571.) A careful study of the documents offered in evidence by the appellant and rejected by the trial court, together with all other evidence bearing upon the subject, leads us to the conclusion that there was no equitable assignment of the insurance policy or any of the proceeds thereof to the appellant, nor was any lien, equitable or otherwise, created in its favor.

"In order to work an equitable assignment there must be an absolute appropriation by the assignor of the debt or fund sought to be assigned to the use of the assignee. The intention of the assignor must be to transfer a present interest in the debt or fund or subject matter; if this is done the transaction is an assignment; otherwise not. What amounts to a present appropriation, which constitutes an equitable assignment, is a question of intention to be gathered from all the language, construed in the light of attendant circumstances." 5 C. J. pp. 909, 910. (See also 3 Pomeroy's Eq. Jur. § 1282.)

It is not necessary that the assigned property shall be actually in being. If it exists potentially—that is, if it will in due course of things arise from the contract entered into —it passes by equitable assignment as soon as it is *in esse.* "Choses in action, contingent interests, and expectancies may be assigned and a valid trust created in them." *Gurnett* v. *Mutual Life Ins. Co.,* 191 N. E. 250. But a mere promise of the clearest and most solemn kind to pay a debt out of a particular fund is not an assignment of the fund even in equity. To make an equitable assignment there should be such an actual or constructive appropriation of the subject matter as to confer a complete and present right on the party meant to be provided for, even where the circumstances do not admit of its immediate exercise.

In *Christmas* v. *Russell,* 14 Wall. 69, as here, the theory of an equitable assignment was based largely upon certain letters which passed between the parties. Of this correspondence the court used the following language, which is peculiarly applicable to the case at bar: "These letters contain no words of transfer, and nothing which by construction or otherwise can have any effect in that way. At most they are only evidence of a promise to pay the judgment, if affirmed, out of the proceeds of one of the notes."

"An equitable lien either arises out of an antecedent and underlying contract, which deals with some specific property, or it arises by implication from the conduct and dealings of the parties, the right or charge being completed by equity, in pursuance of the maxim that equity looks upon things agreed to be done as actually performed. This doctrine, however, is not a limitless remedy to be applied according to the measure of the conscience of the particular chancellor." 37 C. J. 315.

"An equitable lien for advances may exist where advancements of money or funds are made on the faith of certain property, real or personal, under an agreement or

circumstances showing that it was the intention of the parties to pledge such property as security for the advancements, provided the specific property or its proceeds on which the advancements were invested can be traced or identified." 37 C. J. p. 321. (See also *Jones* v. *Carpenter*, 106 So. 127.)

The rule as applied to life insurance is stated by Cooley as follows: "One who has advanced the premiums under an agreement that the policy shall stand as a security for their repayment is entitled to such premiums out of the proceeds of the policy." 7 Cooley's Briefs on Insurance (2d ed.) 6505. Pomeroy says that "where a person, not being owner of a policy of life insurance, nor bound to pay the premium, but having some claim or color of interest in it, voluntarily pays the premiums thereon, and thus keeps it alive for the benefit of a third party, he may thereby acquire an equitable lien on the proceeds of the policy as security for the repayment of his advances." 3 Pomeroy's Eq. Jur. § 1243. (See also *Gifford* v. *Gifford*, 115 Atl. 654.) Equitable liens, however, demand strict proof of the intention of the parties. (*Westinghouse* v. *Brooklyn etc. Co.*, 263 Fed. 532; *Andrews & Co.* v. *Osborne*, 209 Fed. 148.) In the present case no agreement or circumstances existed showing that the parties intended that the policy should stand pledged as security for the advances nor had the appellant any claim or color of interest in the policy. The funds it advanced to Fisher, including the payment of the insurance premium, created nothing more than the relationship of debtor and creditor between the parties.

The statement of account shows that of the entire indebtedness but $301.85 represented advances for the payment of life insurance premiums. The record further shows that the correspondence between Fisher and The von Hamm-Young Company began in February, 1933, and ended November 15, 1933. It further appears that aside

from a portion of the advances for the payment of the insurance premiums the entire indebtedness of Fisher to The von Hamm-Young Company accrued before any letters had passed between them. The letters of Fisher to Bodge, while of a friendly and conciliatory nature, clearly indicated a deliberate purpose and determination on his part to execute no assignment of the life insurance policy to The von Hamm-Young Company. In fact, to the very last Fisher avoided compliance with Bodge's demand. On October 24, 1933, Bodge, in his final letter to Fisher, said: "I am enclosing herewith documents in duplicate, assigning your group policy as collateral security to The von Hamm-Young Company to cover your indebtedness to us. * * * This will protect us and will justify our continuing the group policy. I know you would not want to lose this, and this is the only way we can keep it in force."

On November 15, 1933, Fisher replied: "So I am signing these papers in regards to the group insurance and giving them to Mrs. Fisher, who will take them in and talk to you as soon as she arrives in Honolulu, which should be about Dec. 18th." "These papers" to which Fisher referred did not purport to assign the policy to The von Hamm-Young Company, Limited.

Considering all of the evidence, including that which was excluded by the circuit judge, we find no sufficient evidence to sustain appellant's claim that there was an equitable assignment to appellant and the claim of an equitable lien fails for the same reason.

The decree appealed from carried a judgment for the sum of $192 against The von Hamm-Young Company, Limited, and Walter J. Snyder, jointly and severally. This represents costs of court incurred by the trust company amounting to $14.50, plus $27.50 petitioner's costs and an allowance to the petitioner of $150 as counsel fees. The two last items were deductible from the proceeds of the

insurance policy but were ultimately to be recovered from the losing respondents. We think the costs of court incurred by both the petitioner and the successful respondent were properly assessed against The von Hamm-Young Company and Snyder but in the absence of any showing of bad faith on their part or the existence of any local statutory authority therefor we conclude that the unsuccessful respondents cannot be required to bear the burden of petitioner's counsel fees. Although the courts are not in entire accord (see *Metropolitan Life Ins. Co.* v. *Kinsley,* 109 N. E. 1011) the weight of authority and we think the better rule sanctions the allowance of a reasonable counsel fee to a petitioner in an interpleader suit, to be paid out of the fund in controversy (*Massachusetts Mut. Life Ins.* v. *Morris,* 61 F. [2d] 104; *Trustees* v. *Greenough,* 105 U. S. 527; *McNamara* v. *Provident Assur. Society,* 114 Fed. 910).

The entire fund in litigation with statutory interest, less a deduction of $150 to be retained by the petitioner as counsel fees, should be paid by petitioner to the respondent Hawaiian Trust Company, Limited, as trustee. The petitioner is entitled to recover a joint and several judgment against the respondent The von Hamm-Young Company, Limited, and Walter Snyder for the sum of $27.50. The respondent Hawaiian Trust Company, Limited, is entitled to recover a like judgment against them for $14.50.

The cause is remanded to the court below with directions to modify the decree, entered in the circuit court, conformably to this opinion.

*S. B. D. Wood* for petitioner appeared but filed no brief.

*J. P. Russell* (F. E. Thompson with him on the brief) for respondent The von Hamm-Young Company.

*H. L. Wrenn* (Anderson, Marx, Wrenn & Jenks on the brief) for respondent Hawaiian Trust Company.