THE QUEEN'S HOSPITAL, A CORPORATION, *v.* BRUCE CARTWRIGHT, TRUSTEE UNDER THE WILL OF EMMA KALELEONALANI, DECEASED, LUCY PEABODY, GRACE KAHOALII, ST. ANDREW'S PRIORY, AND HENRY B. RESTARICK.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

ARGUED APRIL 15, 1908.                    DECIDED MAY 8, 1908.

HARTWELL, C.J., WILDER AND BALLOU, JJ.

TRUST—*termination of.*

The will of Queen Emma, made October 21, 1884, appointing a trustee, bequeathed $2100 in four life annuities directing their payment by the trustee in monthly payments, $600 per annum to St. Andrew's Priory for maintenance of four yearly scholarships of $150 each, and devised seven tracts of land to the trustee in trust to devote its rents, income and profits to payment of the annuities and scholarships, giving him power upon the death of all the annuitants to sell one or more pieces of land if the rest would in the opinion of the supreme court produce a yearly income sufficient for the scholarships, one-half of the proceeds going to the Queen's Hospital and the other one-half to be invested by the trustee who was to pay the income to Albert Kunuiakea for life and the principal, at his death, to his issue, dividing any surplus income equally between the hospital and Kunuiakea during his life and, upon his death, his lawful issue; the trustee being further empowered in his discretion, after the death of the life annuitants, to sell the remaining lands investing the proceeds and, after payment of the scholarships out of the income, dividing the surplus between the hospital and Kunuiakea for life and, upon his death, his lawful issue. Two of the life annuitants, whose annuities were $600 and $300 respectively, had died and also Kunuiakea without issue, leaving the hospital, which was the residuary legatee, the sole beneficiary, besides the other annuitants, of the trust property. The trustee has received $35,785 for land taken by the United States government which had previously brought little or no revenue and about $9000 in bonds and mortgages, proceeds of land taken for street widening, yielding an

income of over $406, the rest of the lands, valued at upwards of $68,000, yielding an income of over $5000 which is more likely to increase than decrease.

Held: The court will not, at suit of the hospital resisted by the annuitants, declare the trust to be terminated in respect of property not required for the remaining annuities nor direct the trustee to transfer to the hospital such portion of the trust property as is not so required.

## OPINION OF THE COURT BY HARTWELL, C.J.

The plaintiff seeks a decree ordering the trustee to transfer to it such portion of certain money and other property held under the trusts of the will of Dowager Queen Emma Kaleleonalani for payment of certain annuities as is not required in order to produce sufficient income for the annuities now outstanding, two of the annuitants having died. By her will, executed October 21, 1884, Queen Emma appointed Alexander J. Cartwright her trustee, bequeathed, for their respective lives, to the defendant Lucy Peabody $900 per annum, to the defendant Grace Kahoalii $300 per annum, to Hikoni (w) and Mary Liwai, each now deceased, $600 and $300, respectively, per annum, directing "such annuities to be paid by my said trustee or his successors in regular monthly payments," and bequeathed to St. Andrew's Priory $600 per annum to be applied towards the maintenance of four yearly scholarships of $150 each, and devised seven parcels or tracts of land to Alexander J. Cartwright in trust "to devote the rents, income and profits thereof to the payment of the aforesaid annuities and scholarships." The will provides: "Upon the death of said annuitants then the trustee or his successor may sell any one or more of the aforesaid pieces of real estate free and discharged of any trust, provided the real estate remaining will, in the opinion of the supreme court, produce a yearly income sufficient to provide for the aforesaid scholarships, the proceeds derived from the sale of any land as aforesaid to be divided one-half to the

Queen's Hospital," the remaining half to the trustee in trust "to invest the same and the income to pay to my cousin Albert K. Kunuiakea" and upon his death to pay the principal so invested to his lawful issue living at his decease, "any surplus rents, income or profit derived from said real estate, after the payment of said annuities and scholarships, to be divided as follows: One-half to the Queen's Hospital" and one-half to the trustee in trust to pay the same to the said Albert for life and upon his death to pay said surplus to his lawful issue then living. The will further provides: "After the death of all said annuitants, if for any reason it should be deemed advisable in the discretion of my said trustee to sell the remainder of said real estate hereinbefore charged with the payment of said scholarships, I hereby empower my said trustee or his successor with authority to sell said remaining land or lands free and discharged from any trust, and the proceeds thereof to invest in safe and sound property, holding said property charged with the same trust as aforesaid to pay over the income for the purpose of maintaining said scholarships, rendering the surplus income as aforesaid, one-half to the Queen's Hospital aforesaid, and one-half in trust for the said Albert K. Kunuiakea during his life, and upon his death to those who are the lawful issue of his body living at his decease." The residuary clause of the will, after giving to the hospital one-half of the residue of the estate and one-half to the trustee in trust to pay its income to Kunuiakea for life and at his death to convey the property to his issue, if any, provides as follows: "But if the said Albert K. Kunuiakea should die without leaving lawful issue living at his decease, then I give, devise and bequeath all the said half of said rest, residue and remainder of my said property and estate, and all the said property hereinbefore devised and bequeathed to the issue of said Albert K. Kunuiakea living at his decease, to the Queen's Hospital aforesaid."

The bill avers that Kunuiakea has died without leaving lawful issue and that the trustee holds for the purposes of the trust the sum of $35,785, proceeds of land condemned by the United States government for public purposes, which previously was productive of little or no revenue, and bonds and mortgages of the value of upwards of $9,000 (shown by probate records in Queen Emma's estate to be proceeds of land taken for street widening), yielding an annual income of over $460 and that the rest of the land held in trust and valued at upwards of $68,000 yields an annual income of upwards of $5000, which is more likely to increase than decrease.

The defendants' demurrer, on the ground that the trustee is required by the will to retain all of the trust property until the death of all the annuitants and cannot safely or prudently deliver over to the plaintiff any part of the corpus of the trust fund and that the defendants are entitled to insist that he retain it, was sustained and the plaintiff appealed.

The plaintiff submits that "it is clear from these provisions that if all the annuitants were dead and St. Andrew's Priory had ceased to exist, the Queen's Hospital, being the only remaining beneficiary, would be entitled to receive the whole corpus of the estate. The annuities and scholarships having lapsed the trust would have become a dry one and the statute of uses would apply," or else "the court would declare the trust terminated and order the trustee to convey." In support of the claim of "a portion of the corpus in view of the fact that two of the annuitants are alive and the Priory is also still in existence" it is argued that "the principle applicable to cases where the objects of the trust have ceased to exist is applicable pro tanto to a case in which the objects have been partly performed and there remains in the trustee a large fund greatly exceeding what is necessary to carry out the remaining purposes, and where the trust property consists of several distinct parcels;" in other words, "that this trust has, in effect, become

partly dry, and that, therefore, the residuary devisee is entitled to receive the corpus over and above what is necessary to the performance of the active part of the trust," citing *Inches v. Hill,* 106 Mass. 575; *Sears v. Hardy,* 120 Mass. 524; *Turnage v. Greene,* 55 N. C. 63; *Harbin v. Masterman,* 1 Ch. (1896) 351; *Haw. T. & Invest. Co. v. Barton,* 16 Haw. 294, 301.

The contention of the defendants is that there is no express authority for the proposed action given by the will, nor is there any implied authority, the power to sell after the death of the annuitants showing that the testatrix did not wish this to be done before then although having in mind the inconvenience of keeping the whole estate in trust merely that the scholarships might be provided for; that equity has no power to modify or set aside the provisions of a trust and can only terminate it when all its purposes have been accomplished or, according to much authority, when all the beneficiaries desire its termination and no good reason appears to the contrary; that the testatrix had a legal and moral right to withhold the capital trust fund from the hospital until the death of the annuitants, and the court cannot say what reason she had for doing this entirely aside from protecting the annuitants, citing *Floyd v. Davis,* 98 Cal. 591, 600; *Young v. Snow,* 167 Mass. 287; *Claflin v. Claflin,* 149 Mass. 19; *Hawley v. James,* 5 Paige 318.

The plaintiff submits that there is an inconsistency between the provision for a sale upon the death of the annuitants of one or more pieces if what remains will in the opinion of the court produce income for the scholarships and for distribution of the proceeds and the provision for selling, after the death of the annuitants, the remainder of the land and reinvesting the proceeds. It was the intention, it is suggested, although not expressed, that the first provision should apply to a sale of portions of the trust property before the death of all the annuitants, hence the phrases "remainder of said real estate," and "remaining land or lands" in the second provision, and the

requirement in the first provision for dividing the proceeds because all the lands or proceeds of sales thereof would no longer be required to produce sufficient income for the remaining annuities and the scholarships, while under the second provision the proceeds must be reinvested because it was contemplated that by the time all the annuitants had deceased the unsold lands would yield only the income required for the scholarships. The inconsistency, however, is not apparent between a sale and distribution of proceeds of land not required in order to secure the scholarships and a sale, if found by the trustee advisable, of the rest of the land also with directions to invest the proceeds in other property to be held upon the same trust for paying its income for the scholarships and dividing the surplus income between the hospital and Kunuiakea or his issue.

If it were not for the life annuities and scholarships remaining to be paid out of the income of the trust property the plaintiff would be its sole ultimate as well as present beneficiary and as such would be entitled to a conveyance of it by a termination by decree of a court of equity of the bare trust of merely collecting and paying over the income. It is against the policy of the law to allow the legal title to be held for no other purpose than as a medium for transferring to another all the incidents of ownership by means of what is termed a passive, dry, naked or bare trust. Something more is required of a trustee than merely to collect and pay over the income without discretion as to its application in order to prevent the merger of an equitable with a legal estate. This familiar doctrine is illustrated in the cases cited by the plaintiff, and to some extent in *Harris, Assignee, v. Judd, Administrator,* 3 Haw. 421.

Whether this doctrine which the plaintiff invokes would be applicable after the death of all the life annuitants or upon a release or satisfaction of the remaining life annuities, if the trustee should then decline to dispose of the trust property as

authorized by the will to do, is a question not now presented and is not to be regarded as controlled by the conclusions reached in this case.

The American cases cited in support of the plaintiff's claim do not go as far as it asks the court to go in this case. For instance, in *Turnage v. Greene,* 55 N. C. 63, the fund which was ordered to be paid to a daughter of the testator was eventually to go directly and meanwhile the whole profits went to her. "In her, then, are united the present right to the whole profits and the absolute ultimate dominion which gives as perfect a property as is known to law." A similar case was presented in *Inches v. Hill,* 106 Mass. 575, and in *Sears v. Hardy,* 120 Mass. 524. But the same court dismissed bills to terminate a trust in two cases cited by the defendants in which the circumstances were somewhat similar to those of the present case. In the first, *Claflin v. Claflin,* 149 Mass. 19, the trust created by the will was to pay the proceeds of the sale of the residue of the testator's estate to his son, $10,000 when twenty-one years of age, $10,000 when twenty-five years of age and the balance at the age of thirty years. The court said: "The strict execution of the trust has not become impossible." In the second case, *Young v. Snow,* 167 Mass. 287, the testator had left the residue of his estate to trustees to be held by them for twenty years and then it was to go to his heirs at law, certain annuities meanwhile being required to be paid to his children from the income, surplus income to accumulate for ten years and then be paid to his heirs until the end of twenty years when all of it was to go to them. There was more than enough income for the annuities. The plaintiff, as assignee of one of the children of her share of the trust property, brought a bill to terminate the trust in respect of that share, the other children consenting, but the court said: "Whether the testator made these provisions for one purpose or another is immaterial, since he had the right to order as he did."

The plaintiff does not controvert the defendants' contention that in the American cases cited, in which a trust was terminated or a resulting trust declared, there was no opposition to the jurisdiction being exercised by the court and that all the legal and equitable interests were held by the person in whose favor the decree was made, and that in cases in which opposition was made or when there were outstanding equitable interests the court declined jurisdiction, but it submits that the English practice, as shown in the *Harbin* case, allows exercise of jurisdiction in such matters. The attorneys for the St. Andrew's Priory appear to think that the question is whether the rule of that case shall prevail against American precedent.

At first glance *Harbin v. Masterman* appears to be on all fours with the plaintiff's case and in conflict with American decisions. But the facts in the two cases will be found upon examination to be so essentially dissimilar as to justify and, perhaps, require a different treatment in the English case than in the case at bar. There was a bequest to trustees of the residue of the testator's personal estate upon trust to permit the same to remain in its actual state of investment or to alter or vary the investments and to pay out of the annual income several annuities to certain persons, of whom at his death ten were living. The will required the trustees in every year to invest any surplus income of the trust moneys, whether it should arise from the determination of any annuity or otherwise, upon certain securities named, and, after the death of the survivior of the annuitants, to convert the trust funds and the accumulations into money and stand possessed thereof upon trust in favor of five charities. Directly after the death of the testator his executors instituted a suit for the administration of his estate. In this suit the estate was administered and considerable sums of money were from time to time paid into court and consols purchased therewith and carried over

to separate accounts for payment of the annuities. In 1871 the Vice Chancellor held that the charities were entitled to all of the residuary pure personalty and to the accumulations during twenty-one years from the death of the testator, also that he could not, having regard to the frame of the will, then order a division of the fund, although the annuities were amply secured. He might have ordered a division, he said, if the residuary legatees had been individuals, but as they were charities he thought he ought not to stop the accumulations. In 1893, twenty-one years from the testator's death, the court held that the annuitants had no right to resort to the surplus income of any past or future year or to the accumulations for the purpose of making up any deficiency and that the five charities were entitled equally to all of the surplus income of the pure personalty and the accumulations thereof *"and to such part of the fund in court as represented the same respectively."* This order was affirmed on appeal. In 1894, by consent of nine out of the ten annuitants, certain sums were carried over to their accounts and the provision thus made for their annuities was accepted by them in full satisfaction thereof, with the exception of the tenth annuitant, Mrs. Venables, who did not consent. Her annuity was £150 and the order directed that the sum carried to the credit of her account should be invested in £6000 2½% annuities, the dividends of which were to be paid to her during her life or until further order. She declined to accept this provision. The charities thereupon brought a petition for payment to them of the fund in court other than the sums set apart to answer the annuities. It was conceded that the charities were entitled to have paid out to them the portion of the fund which had arisen from the accumulations of income. The question, as put by the judge, was, "What are the rights of an annuitant?" He said that in the case of an annuity given by a will followed by a gift of residue the rights, as pointed out *In re Parry,* 42

Ch. 570, were "to have such a security as will make it practically certain that the annuities will be paid," and he thought that the same principle applied to Mrs. Venables as in the other class of cases entitling her "to have such portion of the corpus appropriated for payment of her annuity as would make it practically certain that the annuity would be paid by means of the income of that portion." The residuary legatees offered to leave in court a further sum of £2000, making in all £8000 for the account of this annuity. This was because the old consols had been taken up in 1888 and replaced by a new stock bearing a lower rate of interest. On appeal from the decision it was contended for the plaintiff that there was no authority to direct the distribution of the residue after setting aside enough to answer the annuities and that the court could not diminish the corpus of the security against the annuitant's objection. To this argument it was replied that ever since 1734 it had been uniform practice to give to residuary legatees what the testator intended them to have as soon as the annuities were released or sufficient provision for them had been made; that if this were not so "no part of a residue of £100,000 could be paid out to a residuary legatee if an annuitant of £100 a year object." The court dismissed the appeal holding that although according to the strict language of the will the annuity would not come to an end until Mrs. Venables' death, and upon the terms of the will there was no jurisdiction to order the residuary estate to be distributed until after her death, yet the meaning of a will which charges an estate with legacies of this kind and directs that upon the death of the survivor of the annuitants the residue was to be divided is that it is a gift of the residue, subject to the payment of the annuities, and, if ample provision is made for their payment, that it has been the practice to let the residuary legatees have what is theirs, subject to the payment of the annuities.

The will of Queen Emma gives her trustee no power, except upon or after the death of the life annuitants, to change the investment of the lands devised to him in trust, which was not to pay annuities "out of" the income, with no disposition of surplus income, but to "devote all the income" to payment of the annuities and to paying the surplus to the hospital and Kunuiakea while living. The annuities are not charged upon the residue, but are payable from the income of lands set apart by the testatrix as suited for her objects. No funds are in court for its direction. With power to change the investment the trustee might invest in securities not fluctuating in value. Income from land is uncertain, but a court does not contemplate the possibility that principal and interest on national securities will not be paid. The consols in which £8000 were invested in the *Harbin* case insured payment of the annuity, especially if resort to the principal could be made, as suggested by the court, in case of a deficiency.

If the trustee could sell this land and should buy U. S. bonds with the proceeds—at present rates $93,600 would buy two per cent. registered bonds yielding an income of $1800, the amount of the outstanding annuities—the annuities would be fully secured. But this course would not only be of doubtful value to the hospital,—it would nullify the direction of the testatrix that the lands be held by the trustee.

In view of the facts we think that a decree such as was made in the *Harbin* case might, under like conditions, be made by any court of equity jurisdiction. That it was not a departure from practice appears in *Weatherall v. Thornburgh,* 8 Ch. D. 261, which, upon the doctrine of the American cases cited by the defendants, held that a person entitled to a trust fund, subject to payment of an annuity and legacies, was not entitled to it immediately upon a sufficient sum being reserved to provide for the payment since the testator's language did not permit this, and "he had a perfect right to do what his language shows he did, and he did that not merely for the purpose of

postponing the enjoyment of the surplus by the residuary legatee but for the purpose of making an accumulation to provide a fund for the payment of certain legacies which he bequeathed out of the accumulations."

The following cases illustrate the rule. In a trust to pay over the residue of trust funds after expenditure of certain sums of money in establishing an observatory and public baths, erecting a group of bronze statuary and founding a school of mechanical arts although, after sale of the Lick House there were ample funds for all the purposes named, the residuary legatees could not be paid until all the other trusts were performed, since "the will of the trustor is its (the court's) will" (*Floyd v. Davis,* 98 Cal. 591, 601), but a trust to pay the rents, issues and profits to A for life and then to B for life may be terminated by consent of all who are beneficially interested, the trustee's interest in his compensation being "no reason for the continuance of the trust." *Eakle v. Ingram,* 142 Cal. 15.

The object of the trust created in this will is clear. The lands of the testatrix, situated in various parts of Oahu and Kauai, are devised as follows: Two tracts of land to Elizabeth Pratt, one to Mary Liwai, a house lot to Lucy Davis, two pieces of land and a house lot to Grace Kahoalii, two parcels and a house lot to Stella Keomailani, rights of residence to Hikoni (w) and to John and Loui Blossom, nine parcels of land, including the Nuuanu Valley residence and Waikiki residence, to the Queen's Hospital, five tracts of land to the trustee to pay the rents to Kunuiakea for life over to his lawful issue, with power in the trustee at the request of Kunuiakea to sell the same free from the trust holding the proceeds upon the same trust, seven tracts of land to the trustee to divide equally the income, after payment of the annuities and scholarships, between the hospital and Kunuiakea. Whether the income would exceed the annuities or not, it was not until

the death of the life annuitants that any of these lands could be released from the trust, and then, as if at first tentatively, by setting apart such of them as in the opinion of the court would produce income enough for the scholarships, and presumably in case it should appear that the income was more than enough, by allowing the trustee to use his discretion in selling the reserved land, investing the proceeds and paying to the hospital and Kunuiakea the income not required for the scholarships.

Nothing has occurred which the testatrix would not reasonably have anticipated unless the compulsory taking of part of the lands which, without lessening previous revenues, has placed large sums of money in the trustee's hands. But the money must stand in place of the land, "subject to the same trust and to the same ultimate disposition." *Gibson v. Cooke,* 1 Met. 75; *Holland v. Cruft,* 3 Gray 180; *Hovey v. Dary,* 154 Mass. 12. She might have devised the lands to the hospital charged with payment of the life annuities and scholarships and of one-half of the surplus income to Kunuiakea for life, but she preferred, as she had a right to do, to accomplish her object through the medium of a trustee with full knowledge that each time an annuity should fall in the amount of the other annuities would be lessened and the surplus, now payable to the hospital, would be larger.

Decree appealed from affirmed.

*A. G. M. Robertson (Holmes & Stanley* with him on the brief) for plaintiff.

*C. F. Clemons (Thompson & Clemons* on the brief) for St. Andrew's Priory and Henry B. Restarick.

*R. B. Anderson (Kinney & Marx* on the brief) for the Trustee, Lucy Peabody and Grace Kahoalii.

CONCURRING OPINION OF WILDER, J.

I concur only in the conclusion of the court, but with considerable hesitation, however, for the reason that, while techni-

cally it may be correct, practically the result is to tie up property worth over $112,000 in order to produce an annual income of $1800, which seems to be contrary to common sense.