THE QUEEN'S HOSPITAL, A HAWAIIAN CORPORA-
TION *v.* CHARLES M. HITE, TRUSTEE UNDER
THE WILL AND OF THE ESTATE OF EMMA
KALELEONALANI, DECEASED, THE PROTES-
TANT EPISCOPAL CHURCH IN THE HAWAII-
AN ISLANDS AND WALTER D. ACKERMAN,
JR., ATTORNEY GENERAL OF HAWAII.

No. 2750.

ARGUED APRIL 28, 1950.          DECIDED MAY 3, 1950.

KEMP, C. J., LE BARON AND TOWSE, JJ.

OPINION OF THE COURT BY LE BARON, J.

The amended petition of The Queen's Hospital, an
eleemosynary corporation, by count one seeks complete
distribution of corpus of the trust created by paragraph
thirteen of the will of Her Late Majesty, Dowager Queen
Emma Kaleleonalani, and by count two partial distribu-
tion. It alleges *inter alia* that the St. Andrew's Priory,
an eleemosynary institution owned and operated by The
Protestant Episcopal Church in the Hawaiian Islands,
and The Queen's Hospital are the only remaining bene-
ficiaries of the trust and in effect that the St. Andrew's

Priory consents to complete distribution sought under count one without its consent being obtained to partial distribution under count two. A demurrer was filed by the successor trustee under and of the will of the deceased Queen. The demurrer was sustained and the amended petition dismissed in an order entered by the circuit judge at chambers. The Queen's Hospital appeals from that order. On oral argument before this court, however, The Queen's Hospital did not renew the attack it made in its briefs against such order as to count one, but strenuously renewed that attack as to count two, the gravamen being that the issue of partial distribution thereunder as raised by demurrer was erroneously decided in the negative. In the light thereof, the alleged errors of The Queen's Hospital to the construction of the will as adopted by the circuit judge as the reason for his order of dismissal are deemed by this court to be confined to the effect of that order upon count two for the purposes of appeal, such being the purport of the oral representations of The Queen's Hospital in open court. Hence the efficacy of the appeal depends upon what intention the Queen manifested in her will with respect to the partial distribution which count two of the amended petition prays equity to compel.

To grasp fully what purposes the Queen may have had in mind for creating the trust estate sought to be partially distributed, it is first necessary to outline the sixteen paragraphs of her will and then as certain provisions thereof become material to note them as a part of that outline and in the course of this opinion. Broadly speaking, the first ten paragraphs alienate or affect a relatively small part of the Queen's estate, the next three set up and create the trust estate comprised of a relatively large part of the Queen's estate, and the last three alienate the largest part.

Paragraph one made the usual provision for debts and funeral expenses. Paragraphs two, three and four bequeathed small sums of money to servants and retainers and her collection of books to the Honolulu Library. Paragraphs five, six, seven, eight and nine devised small tracts of land to various persons respectively in fee. Paragraph ten gave certain persons the privilege of residing upon two particularly described premises in Honolulu for their natural lives without payment of rent.

Paragraph eleven bequeathed to four persons life annuities totalling $2,100 per annum. Paragraph twelve bequeathed "to St. Andrew's Priory of said Honolulu, the sum of Six hundred Dollars per annum, to be applied towards the maintenance of four yearly scholarships of One hundred and fifty Dollars each, to be called 'Queen Emma Scholarships'." Paragraph thirteen devised and bequeathed seven pieces of real estate to "Alexander J. Cartwright and his heirs and assigns * * * but in trust nevertheless to devote the rents, income and profits thereof to the payment of the aforesaid annuities and scholarships." After so creating the trust, the paragraph continues: "Upon the death of said annuitants, then my said trustee or his successor may sell any one or more of the aforesaid pieces of real estate, free and discharged of any trust, provided the real estate remaining will, in the opinion of the Supreme Court, produce a yearly income sufficient to provide for the aforesaid scholarships. The proceeds derived from the sale of any lands as aforesaid to be divided, one half to the Queen's Hospital, a corporation existing under the laws of the said Hawaiian Islands, and its successors and assigns forever, the remaining half to the said Alexander J. Cartwright and his heirs and assigns, but in trust nevertheless to invest the same, and the income to pay to my cousin Albert K. Kunuiakea, of said Honolulu, during his life, and upon the death of said

Albert K. Kunuiakea to pay the principal sum so invested to the lawful issue of the body of said Albert K. Kunuiakea living at his decease, children of deceased child to take by right of representation their parent's share. Any surplus rents, income or profit derived from said real estate, after the payment of said annuities and scholarships, to be divided as follows: One half to the Queen's Hospital aforesaid and its successors and assigns, and one half to said Alexander J. Cartwright, but in trust to pay the same to the said Albert K. Kunuiakea for life, and upon his death to pay said surplus to the lawful issue of the body of said Albert K. Kunuiakea living at his decease, children of deceased child to take by right of representation their parent's share. After the death of all said annuitants, if for any reason it should be deemed advisable in the discretion of my said trustee to sell the remainder of said real estate hereinbefore charged with the payment of said scholarships, I hereby empower my said trustee or his successor with authority to sell said remaining land or lands free and discharged from any trust, and the proceeds thereof to invest in safe and sound property, holding said property charged with the same trust as aforesaid to pay over the income for the purpose of maintaining said scholarships, rendering the surplus income as aforesaid, one half to the Queen's Hospital aforesaid and one half in trust for the said Albert K. Kunuiakea during his life, and upon his death to those who are the lawful issue of his body living at his decease, children taking by right of representation their parent's share."

Paragraph fourteen devised eight pieces of real estate in Honolulu and the rest, residue and remainder of certain pieces of real estate on the island of Maui to The Queen's Hospital and its successors and assigns forever.

Paragraph fifteen devised five pieces of real estate on the islands of Hawaii and Maui to the said "Alexander J.

Cartwright, his heirs and assigns" but in trust to Albert K. Kunuiakea, hereinafter referred to as "Albert," for life with remainder in fee to the lawful issue of his body.

Paragraph sixteen bequeathed and devised all the rest, residue and remainder of the Queen's estate, "one half to the Queen's Hospital * * * and its successors and assigns forever, and one half to * * * Alexander J. Cartwright, his heirs and assigns in trust nevertheless for the following purposes, viz.: To hold the same in trust, to take charge of and manage the same with full power to him to sell all or any portion of said property and estate, and reinvest the proceeds of the same in his discretion, and pay over the net rents, interest, income and profits of said property and estate to the said Albert * * * during his natural life, and at his death to convey the said premises, property and estate to those who may be the lawful issue of the body of said Albert * * * living at his decease, children to take by right of representation their parent's share. To have and to hold unto them, their heirs and assigns forever. But if the said Albert * * * should die without leaving lawful issue living at his decease, then I give, devise and bequeath all the said half of said rent, residue and remainder of my said property and estate, and all the said property hereinbefore devised and bequeathed to the issue of said Albert * * * living at his decease, to the Queen's Hospital aforesaid and its successors and assigns forever."

The foregoing suffices to give a short summary of the Queen's will with pertinent parts quoted.

The trust to pay annuities and scholarships out of yearly income and to pay surplus income had its inception in the year 1885 on the death of the Queen. At that time Albert and the four annuitants were living and the St. Andrew's Priory and The Queen's Hospital were, and now are, existing. Each of the four annuities so long as

its respective annuitant lived constituted a charge of fixed amount against yearly income and each of the four scholarships since inception has constituted such a charge. The aggregate of all such charges totalled $2,700 at the inception of the trust and the yearly income thereafter presumably has always exceeded that amount, there being nothing to the contrary and such income being alleged by the amended petition and admitted on demurrer to have been in excess of $50,000 for the last five years. Nevertheless, the aggregate amount of annuities in the sum of $2,100 at inception was progressively reduced thereafter until it reached the zero point as one after another of the annuities terminated by operation of law upon the successive deaths of the annuitants. But the aggregate amount of scholarships in the sum of $600 at inception has remained constant thereafter by operation of will.

The dominant purpose of the trust is to pay and insure payment of the charges of fixed amount against yearly income which may be existing from time to time whether they be merely the scholarships or additionally thereto one or more of the annuities. Its subordinate purpose is to benefit The Queen's Hospital and Albert equally during his life by paying to each one-half of the surplus income left after existing charges have been paid or to benefit solely The Queen's Hospital after Albert's death without lawful issue of his body by paying to that corporation the whole of such surplus income. Thus, while the last annuitant to die and Albert lived, the trust consisted of two primary and two secondary phases of trust which consumed all the income each year. The primary phases during that period were to pay annually the existing annuities or annuity as the case may have been and to pay annually the scholarships. The secondary phases were to pay the surplus income left after payment of such charges of fixed amount under the primary phases, one-half of

such surplus income to be paid to The Queen's Hospital and the other half thereof to Albert. From the nature and interplay of these phases of trust it is apparent that the termination of any annuity during the life of the last annuitant to die operated to increase the amount of surplus income and that the surplus income as a whole in any particular year of that period amounted to the margin of safety for the protection of the payment of existing charges of fixed amount. The period in which the trust consisted of such four phases of trust, however, did not persist as already indicated.

Albert died without issue in 1903. By virtue of paragraph sixteen, the secondary phase of trust to pay one-half of surplus income to Albert for life then became one to pay it to The Queen's Hospital forever. Such operation constituted a merger of the two secondary phases into one secondary phase of trust under which The Queen's Hospital from that time forward became the sole beneficiary of both halves of surplus income. However, it had no effect upon the two primary phases of trust. They continued in conjunction with each other until the death of the last surviving annuitant in 1928. At that time such death operated as a matter of law to terminate the final vestige of the primary phase of trust pertaining to annuities. Since that time, the trust has consisted merely of the primary phase to pay the scholarships as the only existing charges of fixed amount against yearly income and of the secondary phase to pay surplus income as a whole.

The margin of safety once protecting the payment of the annuities and the scholarships would protect only that of the scholarships after the termination of the annuities so as to increase the surplus income thereafter payable to The Queen's Hospital in the absence of a manifest intention of the Queen to the contrary. At this juncture it

should be borne in mind that the event of the death of the last surviving annuitant is the culminating episode in a series of operations of law so substantially reducing the aggregate amount of charges of fixed amount against yearly income that such aggregate amount became more than four times less than it had been at the inception of the trust. Pertinent thereto, that event marks the occasion on which the Queen in paragraph thirteen authorizes the trustee then to make a comparable reduction in the aggregate amount of the real estate in trust so that the yearly income thereafter will be decreased and yet be adequate to pay and insure the sole existing charge of fixed amount against it in the sum certain of $600, no more and no less. She does so in effect by granting to the trustee on that occasion a power of sale to alienate free of trust so much of the trust real estate as will leave in trust a remainder capable of producing a yearly income of $600 or one sufficient to provide for the scholarships. This grant is coupled with a direction to distribute the entire proceeds of sale, divested of any trust, to The Queen's Hospital as an admitted outright gift, one-half thereof to be given by direct devise under paragraph thirteen and the other by indirect devise under paragraph sixteen where as here there had been met the condition subsequent of Albert's death without lawful issue of his body. Clearly the exercise of that power under the facts of this case on the occasion noted would have transferred from the trust the larger part of the trust real estate. It thereby would have dried up at its source the great bulk of surplus income otherwise payable to The Queen's Hospital. Such operation would have narrowed the margin of safety for the protection of the payment of the scholarships to the reduced surplus income from the remaining smaller but sufficient part of the trust real estate. At the same time

the loss in surplus income to The Queen's Hospital would have been assuaged by the operation of the directive to distribute forthwith the proceeds of sale to that corporation as an outright gift pursuant to the will.

The crux of the appeal concerns the character of the power of sale to reduce the amount of trust real estate as authorized by paragraph thirteen and the problem of construction before this court pertains to the extent of corpus or amount of real estate to exist or to be retained in trust during the present period of trust after the death of the last surviving annuitant. The trustee takes the position that the power is discretionary and may be exercised at any time in perpetuity commencing with that period and The Queen's Hospital that it is mandatory and must be exercised upon or within a reasonable time after the commencement of that period. Both parties, however, concede that, irrespective of the other phases of trust, the phase to pay the scholarships out of yearly income is a perpetual charitable trust and that the corpus of that trust during the former period before the death of the last surviving annuitant consisted of all the real estate placed in trust at inception even though such corpus was then common to the other phases of trust then existing. The appeal thus draws the attention of this court to the present period of trust under the will and to the point of transition between it and the former period of trust thereunder.

The alleged errors challenge the circuit judge's construction of the will in giving to the trustee a discretionary power to sell or not to sell a portion of the trust real estate upon the death of the annuitants and thereafter in perpetuity as he may deem advisable. At the risk of tediousness, the grant of power in paragraph thirteen is again set forth. Its pertinent language reads: "Upon

the death of said annuitants, then my said trustee or his successor may sell any one or more of the aforesaid pieces of real estate, free and discharged of any trust, provided the real estate remaining will, in the opinion of the Supreme Court, produce a yearly income sufficient to provide for the aforesaid scholarships. The proceeds derived from the sale of any lands as aforesaid to be divided, one half to the Queen's Hospital * * * and its successors and assigns forever, the remaining half to" the trustee, "but in trust nevertheless to invest the same, and the income to pay to my cousin Albert * * *, during his life, and upon the death of said Albert * * * to pay the principal sum so invested to the lawful issue of the body of said Albert * * * living at his decease, children of deceased child to take by right of representation their parent's share."

The trustee plants his case upon the literal meaning of the word "may" in the quoted part of paragraph thirteen and argues that its employment in the phrase "may sell any one or more of the aforesaid pieces of real estate" warrants the adoption of the construction made by the circuit judge.

The Queen's Hospital contends that the word "may" should not be interpreted literally out of context any more than should be the preceding words of "upon" and "then" to limit the exercise of the power of sale to the day of the death of the last surviving annuitant and to that specific day only. It argues that the Queen would have used more definite terms of discretion to describe the power to sell the excess over the remaining real estate had she intended that the sale thereof was to be made in the trustee's discretion as she used in the same paragraph relative to a comparable power to sell the remainder by stating that "if for any reason it should be deemed advisable *in the*

*discretion* of my said trustee to sell" and also in paragraph fifteen relative to a comparable power to sell the premises held in trust for Albert by stating that the trustee or his successors "may, *in his or their discretion, sell.*" (Emphasis added.) The Queen's Hospital insists that the quoted part of paragraph thirteen authorizing sale upon the death of the annuitants should be construed from the four corners of the will. It reasons therefrom that when so construed such authority would constitute a mandatory direction to sell at that time all the real estate of the trust except so much thereof as will be sufficient in the opinion of the presiding judge in equity to produce a yearly income to pay the scholarships, and amount to a permissive direction as to what piece or pieces of the trust real estate shall be sold free of trust depending upon the value thereof and subject to the judge's opinion as to the sufficiency of the remaining piece or pieces to be held in trust.

Paragraph thirteen upon the death of the annuitants constitutes more than a grant of power to sell a part of the real estate free of trust. It includes therein an authority to choose "any one or more" pieces of that real estate as the particular part thereof proposed to be sold under the power. There is no doubt that such authority is one to do a discretionary act of selection to which the ordinary discretionary connotation of the word "may" applies within the descriptive clause of the dual grant that the trustee "may sell any one or more of the aforesaid pieces of real estate." On superficial examination of that descriptive clause standing alone, such connotion appears to apply to the power of sale with equal force as it does to the authority of choice. But on penetrating below the surface of the clause by reading it in context with the paragraph, a necessary implication to the contrary arises

as well as a patent ambiguity relative to the sense in which the intransitive verb "may" was used in relation to the verb "sell." That ambiguity admits of two possible constructions, one of discretionary and the other of mandatory character of the power as to time of sale. Illustrative of the latter construction, the paragraph as to the exercise of the power of sale is reasonably susceptible to being paraphrased to read in effect that "upon the event of the death of the annuitants, then a part of the real estate must be sold free of trust so as to leave thereafter only the remainder of such real estate in trust which is sufficient to pay the scholarships." Such ambiguity of doubtful meaning is not created artificially but stems from the import of the actual language employed by the Queen and obscures her intention. It therefore requires that the entire will be construed in order to determine and give effect to that intention. Hence no single word of the ambiguous clause should be literally interpreted as though standing alone. Each word, phrase, clause and sentence of the paragraph should be considered in relation to each other and the paragraph itself construed as a part of the will as a whole. Determinative of the true construction to be adopted between the divergent constructions of a discretionary and of a mandatory power of sale as urged respectively by the trustee and The Queen's Hospital are the consequences which would flow from the adoption of one as against those from that of the other.

The construction of discretionary power as urged by the trustee to sell or not to sell a portion of real estate at any time advisable upon and after the death of the annuitants would operate to empower the predecessor trustee at such death and his successors thereafter to hold all the real estate in perpetual trust. This construction conflicts with the presupposition implicit in language else-

506

where employed in the same paragraph that after the death of the annuitants only a comparatively small part of the real estate then exists in trust. Moreover, such unlimited time of exercise is in complete disregard of the contrary time limitation connoted in the grant of power that the trustee *"Upon the death of the annuitants, then * * * may sell * * *."* (Emphasis added.) Under the construction of a discretionary power, exercisable in perpetuity, the power might never be exercised and *a fortiori* the gift relating to proceeds, which is dependent upon the exercise of that power, might never be made to the lawful issue of the body of Albert had he died leaving such issue. The possibility of such an unlawful postponement defeats the provision of gift to the issue of Albert and renders it ineffective and void under the rule against perpetuities, that rule being in force in this jurisdiction. (See *Mfgrs Co. v. von Hamm-Young Co.,* 34 Haw. 288.) This court, however, takes cognizance of the principle that the rule against perpetuities is not a rule of construction but a rule of property and does not invoke it to ascertain the Queen's intention. (See *Milliken National Bank v. Wilson,* 343 Ill. 55, 174 N. E. 857; Gray, *The Rule Against Perpetuities* [4th ed.] § 629.) Nevertheless, where as here the ambiguous clause of paragraph thirteen is fairly open to two possible constructions of opposite import, the one of discretionary power, turning as it does the provision of gift to the issue of Albert into an illegal perpetuity, will not be preferred over the other of mandatory power if such other upholds the validity of that provision consistently with the rule. (See *In re Peck's Estate,* 96 Vt. 183, 118 Atl. 527; *Singhi v. Dean,* 119 Me. 287, 110 Atl. 865; *Westport Paper-Board Co., Inc. v. Staples,* 127 Conn. 115, 15 A. [2d] 1; Gray, *The Rule Against Perpetuities* [4th ed.] § 633.)

The construction of mandatory power exercisable upon the death of the annuitants as urged by The Queen's Hospital renders the provision of gift to the issue of Albert valid and operative so as not to transgress the rule against perpetuities. The law therefore favors such construction and presumes that the Queen intended a valid rather than an invalid provision of gift to the issue of Albert. (See *In re Peck's Estate, supra*.) But this court does not propose merely to avoid the effect of the rule against perpetuities even if the two possible constructions were otherwise on a par with each other. On the contrary, it construes the Queen's will exactly in the same way as if the rule had never been established so as to determine her intention without regard to the rule. In doing so it finds that none of the adverse consequences which would flow from the adoption of the construction of discretionary power attaches to that of the construction of mandatory power and that independently of the effect of the rule against perpetuities the construction of mandatory power constitutes the true construction of the Queen's will. No further reference to that rule, therefore, need be made.

A bare reading of paragraph thirteen suffices to demonstrate that there is no unequivocal declaration of intention to permit the trustee to hold all the real estate in perpetual trust without regard to the time limitation connoted in its grant of power to sell a part thereof free of trust. But there are strong indications from the language employed that the Queen manifested a contrary intention. The index of these indications of intention is the death of the last surviving annuitant as the crucial point of transition between two periods of the trust or as the culminating episode of substantial reduction in the aggregate amount of charges of fixed amount against yearly income when the scholarships first emerged as the

only existing charges thereof. The event of that death, therefore, affords the most favorable opportunity to constrict the yearly income at its source consistently with the reduction of charges of fixed amount against it. Consonant to the reasonable assumption that the Queen so considered that event as such an opportunity, she chose it as the occasion for the exercise of the power which would reduce substantially the aggregate amount of trust real estate and thereby narrow its production of yearly income to provide merely for the scholarships. Nor is it reasonable to assume that she intended that the trustee may indefinitely defer the exercise thereof and forego the seizure of opportunity afforded him. Such an assumption is irreconcilable to the fact that neither the paragraph nor any other part of the will deals with all the real estate as existing in trust after that occasion, but the paragraph presupposes that within a reasonable time from such occasion the trustee will have exercised the power of sale as *a fait accompli* and takes for granted that there will be left only "the remainder of the aforesaid real estate hereinbefore charged with the said scholarships" as existing in trust thereafter. Thus from a cursory reading of the paragraph, the reasons for adopting the construction of a mandatory power as to a definite time of sale appear to be more cogent than those for adopting that of a discretionary power as to an indefinite time of sale. The ambiguity, however, is to be resolved by a painstaking scrutiny of paragraph thirteen itself and of it as a part of the will in determining and giving effect to the Queen's intention, one test being that none of the consequences from the adoption of the construction of mandatory power as urged by The Queen's Hospital defeats any purpose of the Queen as drawn from the general plan, scope and design of her will.

Paragraph thirteen permits no conversion of the trust real estate during the lives of the annuitants and requires it to be kept intact until the death of the last surviving annuitant. (See *Queen's Hospital* v. *Cartwright*, 19 Haw. 52.) But on the occasion of such death the paragraph grants a power to sell free of trust as much of the trust real estate as will leave in trust a balance of real estate that will produce a yearly income of the required sufficiency and after that occasion a power to sell free of trust such balance. The first power is exercisable for the purpose of distribution and the second for the purpose of trust investment relative to the respective proceeds of sale. The paragraph significantly makes no express direction to sell in the trustee's discretion under the first power, but does so under the second. Nor does it describe a definite object of sale for either power but makes the object of sale for the first the correlative of that for the second and describes that latter object as *"the* remainder." (Emphasis added.) Obviously that remainder cannot exist or be particularized until its logical antecedent has been made a definite object of sale and then sold under the first power. The exercise of the first power, therefore, is the condition precedent to any exercise of the second, otherwise the grant of the first would be at cross purposes to that of the second and frustrative of the Queen's manifest intention to allow, the trustee full play of his discretion to sell the remainder at any time he deems advisable after the death of the annuitants. In short, the paragraph so treats the successive powers and correlative objects of sale that there arises the inescapable implication that the first power is mandatory in character as to a time of sale that is prior to the period for any exercise of discretion under the second power. This implication is synchronous in operation to the time when the trust real estate becomes freed of the

larger charge to pay the annuities and is indicative of a purpose to cut drastically the size of that estate at that time in order to serve more appropriately the smaller charge to pay the scholarships thereafter. It is corroborative of the presupposition of the paragraph that only the part of the trust estate left over from the sale under the first power is to exist in trust after the death of the annuitants as the sole allowable period for any exercise of discretion under the second power. Such implication is consonant to the mandate of the same paragraph to distribute the proceeds derived from the exercise of the first power and complementary to the mandatory direction implicit therein to reserve the required remainder. It is in harmony with the reasonable inference that had the Queen intended a discretionary sale under the first power she would have employed terms of discretion comparable to those used to describe the sale under the second power, the inevitable conclusion therefrom being that she knew how to employ such terms and omitted them advisedly. It is thus so strong in its probabilities that the contrary thereof cannot be reasonably presumed and therefore constitutes a part of the description of the first power as though expressed. Consequently, the implication amounts to a component of that description and as such resolves the ambiguity as to the character of the power depicted therein. It demonstrates that the Queen intended the power to be mandatory as to time of sale and accordingly used the intransitive verb "may" within the description in the sense of "must" as an auxiliary to the verb "sell." (See *McMillan* v. *Barnard Free Skin & Cancer Hospital*, 304 Mo. 635, 264 S. W. 410; *Ellis* v. *Aldrich*, 70 N. H. 219, 47 Atl. 95.)

The first power, so construed to be mandatory as to time of sale, is included in the same grant by paragraph

thirteen with an authority to choose "any one or more of the aforesaid pieces of real estate" as the particular property proposed to be sold under the power. This authority by its very nature as already indicated permits a discretionary act of selection and its character to that extent is controlled by the literal meaning of the word "may" which such act supplements. It is evident therefrom and from the mandatory character of the power by necessary implication that the ordinary discretionary connotation of "may" was intended in the dual grant to apply only to the authority of choice.

The exercise of the discretionary authority of choice, so interpreted, operates to advise the presiding judge in equity by giving him the benefit of the trustee's wisdom. But paragraph thirteen places the ultimate responsibility for what must be actually sold under the mandatory power upon such judge and hence requires him on due notice of the trustee's selection to make a judicial determination of the sufficiency of the precise property to remain in trust as the counterpart or determinant of the precise property to be sold free of trust. Thus such judicial determination intervenes after the exercise of the authority and before that of the power and settles the order of sequence for the exercise of each. Nevertheless, the authority, although discretionary as to choice, is not discretionary as to an unlimited time in which to make that choice. By intendment of the paragraph the exercise of the authority and that of the power as well as the intervening judicial determination are articulate parts of the same operation and circumscribed to the occasion of the death of the last surviving annuitant but synchronized to a reasonable time in contradistinction to an unreasonable time thereafter.

For the sake of convenience in considering the entire will the part of the trust real estate, severable therefrom

by sale and distribution of proceeds under the first power, will be referred to hereinafter as "the excess real estate" and the remaining counterpart, subject to sale and investment of proceeds under the second power, as "the remainder charitable trust estate."

The paramount intention of the Queen when construed from her will as a whole is twofold. That intention is to make it a practical certainty, not only that the excess real estate shall be sold free of trust upon the death of the annuitants, but that the scholarships will be paid in perpetuity out of the income from the remainder charitable trust estate after the death of the annuitants. Thus neither is the charitable trust to be impaired nor the entire pre-existing trust real estate to be encumbered. In correlation, the dominant purpose of paragraph thirteen is to make an outright gift to The Queen's Hospital of the proceeds derived from the sale of the excess real estate, when as here Albert's death without issue occurred prior to the death of the last surviving annuitant. Comparable to such purpose are the purposes of paragraphs fourteen and sixteen to give outright the great bulk of the Queen's real estate to The Queen's Hospital through direct devise, and through indirect devise on condition subsequent of Albert's death without lawful issue of his body. Consonant thereto paragraph thirteen provides a process whereby the excess real estate is to be carved out of the trust estate for the sole benefit of The Queen's Hospital, the objective being a partial distribution of corpus in the form of proceeds of sale with a resulting constriction of corpus in the form of real estate to the remainder charitable trust estate. But the Queen thereby did not purport to thwart any purpose of charitable trust or to deprive any beneficiary of pre-existing rights. On the contrary, she intended to preserve the trust more efficiently and at

the same time to keep it constant and effective. Nor does the will in express terms or by implication require the consent of any beneficiary of trust with respect thereto and therefore the paramount intention of the Queen may be effectuated irrespective of whether or not the consent of such beneficiaries has been obtained. Consequently, the absence of consent from the St. Andrew's Priory is immaterial and so is the impossibility of consent from those unascertainable students who in the future may enjoy the scholarships.

Under the will, so construed, the trustee upon the death of the last surviving annuitant has the initial duties of trust to choose the particular property he proposes to sell and to submit to the presiding judge in equity the composition of the remaining property proposed to be held in trust. The performance of those duties renders it incumbent on that judge to determine the sufficiency of such remaining property in accordance with the will. His determination, however, necessitates either an acceptance or a rejection of the submitted composition of the remaining property proposed to be held in trust. But the latter alternative requires the judge to order an increase or decrease in the size of such property as the requirements of sufficiency may warrant with a corresponding decrease or increase in the size of the other property proposed to be sold. Nevertheless, his determination of sufficiency under either alternative causes the identity of the remainder charitable trust estate to be established as the counterpart of the excess real estate. It thereby brings about a disentanglement of further duties of trust so as to divide them into two sets for the trustee to perform. One set is transitory toward the excess real estate. It is to sell the excess real estate free of trust and distribute the proceeds of sale to The Queen's Hospital as the sole bene-

ficiary in strict compliance with the will, or in lieu thereof and at the election of The Queen's Hospital to distribute the excess real estate itself free of trust to that corporation in substantial compliance with the will. The other is perpetual toward the remainder charitable trust estate. It is to pay to the St. Andrew's Priory $600 per annum toward the scholarships from the income of the remainder charitable trust estate and then to pay to The Queen's Hospital any surplus income therefrom after the payment of the scholarships but without further distribution of corpus to that corporation unless the value of the estate so increases thereafter as to warrant such distributions from time to time in furtherance of the paramount intention of the Queen.

It is now more than two decades since the initial trust duties of choice and submission under the will first arose at the death of the last surviving annuitant. Yet to date those duties have not been performed. Consequently, there has been no judicial determination of sufficiency, establishing the identity of the remainder charitable trust estate as the counterpart of the excess real estate, to render the first power of sale capable of exercise. As a result the trust real estate continues to be an aggregate whole, its size at the present time being the same as it would have been under the will had the annuitants not died.

The trustee declines to act. He not only misconstrues the will as did the circuit judge but erroneously assumes that the issue of partial distribution is *res judicata*. This assumption is premised not only upon certain instructions from a circuit judge at chambers made in response to a question propounded by the trustee on taking office as successor trustee in a bill for instructions filed in a prior proceeding after the death of the annuitants, but upon a recorded opinion of this court on appeal from those in-

structions.  (See *Hite* v. *Queen's Hosp. et al.,* 36 Haw. 250.)  The question designated as question (2) as amended raised the issue of partial distribution and the instructions resolved that issue in the negative.  On appeal those instructions among others were assigned as error by The Queen's Hospital.  Despite the fact that the issue of partial distribution then was one for appellate review, the trustee as appellee and The Queen's Hospital as one of the appellants as well as the other appellants ignored the issue on the ground that "The trustee does not require any instruction on this point at this time."  The Queen's Hospital took the position that "The question propounded by the petitioner [*i. e.,* trustee] as to the termination of the trust is not a live question and needs no answer."  The trustee took practically the same position.  In his reply brief, the trustee made the following statement:  "From this it would appear that the Hospital believes that the question as to the termination of the trust should not have been answered, in which conclusion, after a review of the authorities, the Trustee concurs. The better reasoning appears to be that such question may not properly be presented by a bill for instructions, but only by a bill brought by one or more beneficiaries, or by the Trustee himself, to terminate the trust and distribute the remaining assets."  All the parties on appeal plainly indicated by words and conduct that they looked forward to a time when the issue of partial distribution would be material in the future as epitomized in the opening brief of The Queen's Hospital by the following statement:  "If and when a proceeding is brought by the Hospital and the Priory to terminate the trust, the subject will of course be fully dealt with.  (*Hite* v. *Queen's Hosp. et al., supra,* at 312.)  Such consensus of the parties is tantamount to an agreement to withdraw the issue from liti-

gation at that time in tacit repudiation of the instructions resolving it. Accordingly, this court on appeal from those instructions did not consider the assignment of error to them or decide the question of construction involved in that assignment. Nor did it reexamine the issue of partial distribution. To be consistent therewith, the bare affirmance by this court of those instructions to the extent that they are responsive to question (2) as amended is explicable upon the theory that the instructions were affirmed without prejudice to a subsequent suit in which the issue of partial distribution may be litigated to a final judgment. To prevent any other explanation from being drawn therefrom, this court by amendment of its opinion held the issue of partial as well as that of complete distribution in abeyance for future disposition in accordance with the view taken by the parties on appeal. This amendment reads: "What we have said with respect to question number (2) as amended and the response thereto of the circuit court is to be understood as being without prejudice to the right of The Queen's Hospital and St. Andrew's Priory, or either of them, to hereafter file a petition, if they be so advised, praying for a decree terminating the trust created by the will of Emma Kaleleonalani and distributing the corpus of the estate to those entitled thereto." (*Hite* v. *Queen's Hosp. et al., supra;* Sup. Ct. Rec. No. 2487, p. 759.) Consonant thereto, this court did not purport to make a final determination of the issue of partial distribution but decreed an affirmance of the instructions "with the qualifications stated in the opinion, and as amended * * *."

In the light of the above state of the record on appeal, it must be borne in mind that the instructions of the circuit judge made in response to question (2) as amended were merged into and became wholly absorbed by this

court's bare affirmance as qualified in its opinion and by its amendment thereof so that those instructions completely lost their identity as a final determination of the issue of partial distribution. But such affirmance instead of finally determining that issue merely paved the way for its final determination in a subsequent proceeding and thereby rendered the doctrine of *res judicata* inapplicable thereto. The issue is therefore litigable in the instant proceeding, there being no other proceeding which has raised the issue since the entry of such affirmance. The most that now can be said favorably to the trustee about that prior affirmance, however, is that it operates to absolve him for breach of trust in case the issue is finally determined in the affirmative after a hearing on the merits of the amended petition under count two and to prevent him from being held accountable for not making partial distribution prior to that time. With such operation, The Queen's Hospital is in agreement, nor does its amended petition pray to the contrary.

The instant proceeding is the first attempt by court action to compel partial distribution of corpus since the initial trust duties of choice and submission arose under the will upon the death of the annuitants. Before that time, while two of the annuitants were living, such an attempt, however, was made. (*Queen's Hospital* v. *Cartwright,* 19 Haw. 52.) This court in that case affirmed the decree of the presiding judge in equity who had sustained a demurrer on the ground of construction substantially to the effect that the trustee is required by the will to retain all the trust property until the death of all the annuitants which entitled the living annuitants and the St. Andrew's Priory on joining in the demurrer to insist that he do so. But it did not decide whether the doctrine of merger of an equitable with a legal estate for termina-

tion of the trust therefore would be applicable "after the death of the life annuitants or upon a release or satisfaction of the remaining life annuitants, if the trustee should then decline to dispose of the trust property as authorized by the will to do," nor was that question presented or regarded as being controlled by the conclusions reached. (*Queen's Hospital* v. *Cartwright, supra,* at pages 57, 58.) Unlike that case, all the annuitants in this one are dead and the sole beneficiary of partial distribution urges it.

Had the trustee's initial trust duties of choice and submission been timely performed, the measure of the property to be held in trust to the entire trust estate, as it existed during the lives of the annuitants, conceivably might have been taken by the presiding judge in equity to be the proportion which the single charge of $600 had to the pre-existing composite charge of $2,700, but any effectiveness which such a measure may have had has been destroyed by the increased value of such estate caused by natural increment brought by lapse of time and changing conditions, so that it is now worth more than a million dollars and yields a yearly income of more than fifty thousand dollars, as alleged in the amended petition and admitted on demurrer, while the charge of $600 per annum has remained fixed by the will. To allow the trustee to hold real estate of such magnitude in perpetual trust at a yearly cost of more than $2,630 for fees to the trustee in addition to other necessary administrative charges in order merely to pay a fragmentary part of the income amounting to a fraction of the cost would not only defeat the paramount intention of the Queen as to gift, but would be unconscionable and repugnant to common sense and reason. Nor can it be reasonably presumed that the Queen contemplated such a preposterous result or intended such

needless loss and hardship to be inflicted upon The Queen's Hospital.

The situation relative to giving effect to the Queen's intention invokes the intervention of a court of equity similar in nature to that made by the probate court and affirmed by this court on appeal in the case of *Estate of Brown,* 25 Haw. 327, wherein the probate court properly exercised its jurisdiction to prevent the same type of injustice even though the equities were far less than those of this case. In that case, a will placed a charge of $1,200 per annum to pay an annuity against the income of a residuary estate valued at $250,000, but the probate court against the consent of the annuitant ordered the entire estate distributed to the residuary legatee save and except certain bonds of the par value of $35,000, drawing four and one-half per centum interest, which were ordered set apart from the estate to secure and pay the annuity. But a more comparable situation is found in the case of *Harlow* v. *Weld* (R. I.), 104 Atl. 832, where an equity court in a bill for instructions had before it a trust estate valued at more than three million dollars impressed with the charge to pay annuities amounting to $5,500 under a will which directed that the entire estate be kept intact until the death of every individual annuitant and required the surplus income after payment of the annuities to be paid to the settlor's widow and son. On certified questions the supreme court of Rhode Island remanded the cause, ordering in effect a proceeding to ascertain what particular parts should be distributed and the sufficiency of the remainder to secure the annuities, presumably on the theory that the annuitants having consented to the partial distribution urged by the widow and son all the parties to be affected thereby were agreed and that it is hardly conceivable that the settlor, if he had foreseen the situation,

would intentionally have directed that so large an estate should be kept together solely to pay so small an amount in annuities. The situation in the instant case is a stronger one. Not only are the annuitants dead but the sole beneficiary of partial distribution urging it is a charitable corporation (see *In re Queen's Hospital,* 15 Haw. 663) and the most favored object of the Queen's bounty through-out her will, which as heretofore pointed out requires no consent to partial distribution from any beneficiary of trust.

The time for strict compliance with the will has long since passed. The Queen's Hospital as sole beneficiary of such compliance, however, does not insist upon it, but does insist upon substantial compliance to have the excess real estate in lieu of proceeds of sale thereof distributed to it forthwith. To do so at the election of The Queen's Hospital would not defeat any material purpose of the will. The situation as it is today thus obviates strict, but calls for substantial, compliance with the will. It is one, there-fore, which warrants the intervention of equity to give effect to the paramount intention of the Queen. This is to be accomplished by ascertaining what property the trustee in his wisdom deems advisable to hold in trust under the will, by determining the sufficiency of that property in accordance with the will so that the remainder charitable trust estate and its counterpart, the excess real estate, can be ultimately identified as the requirements of suffi-ciency may warrant and by decreeing an immediate dis-tribution of the excess real estate to The Queen's Hospital. (See *In re Vanderbilt's Estate,* 236 N. Y. S. 316, 134 Misc. 574.) Such proceedings, however, would entail a setting apart of property for the purpose of maintaining the perpetual charitable trust of which the only remaining beneficiaries named in the will are the St. Andrew's Priory

and The Queen's Hospital. Those proceedings in this case would be at the instance of The Queen's Hospital as the sole beneficiary of partial distribution as well as one of the beneficiaries of trust and require both the St. Andrew's Priory and the attorney general in his capacity of *parens patriae* of all public charities to be heard and held as proper and necessary parties thereto. Nothing further need be said other than that the second count of the amended petition on demurrer presents a case in equity of partial distribution.

The order in so far as it affects the second count of the amended petition is set aside and the cause under that count remanded below for further proceedings consistent with this opinion.

*J. G. Anthony* (*Robertson, Castle & Anthony* on the briefs) for appellant.

*H. R. Hewitt* (*R. D. Welsh* with him on the brief) for appellee Charles M. Hite, trustee.

*Austin W. Scott,* Professor, Harvard Law School, of counsel, also filed a brief on behalf of appellee Charles M. Hite, trustee.

*M. Sapienza,* Deputy Attorney General, filed a brief in behalf of appellee Walter D. Ackerman, Jr., Attorney General.